NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

OVERNITE TRANSPORTATION COMPANY, Respondent.

No. 8507.

United States Court of Appeals Fourth Circuit.

Argued March 22, 1962.

Decided Sept. 4, 1962.

Robert Sewell, Attorney, National Labor Relations Board (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Melvin Pollack, Attorney, National Labor Relations Board, on the brief), for petitioner.

J. W. Alexander, Jr., Charlotte, N. C. (Ernest W. Machen, Jr., and Blakeney, Alexander & Machen, Charlotte, N. C., on the brief), for respondent.

Before SOBELOFF, Chief Judge, and BRYAN and J. SPENCER BELL, Circuit Judges.

SOBELOFF, Chief Judge.

This petition for the enforcement of an order of the National Labor Relations Board, requiring the company to reinstate with back pay 30 employees, presents an immense record of over 1400 pages which, even after condensation by the parties, runs over 700 pages of printed appendices. As often happens in section 8(a) (3) [1] cases, there is conflicting evidence on almost every point, employees swearing to one version and company personnel another. If the reader is to have a fair grasp of the reasons for our disposition of the case as to each of the persons involved, a recital of the diverse fact situations, however sharply abridged, is still unavoidably lengthy.

## I. GREENVILLE TERMINAL

The Teamsters Union held a meeting in a city park on June 20, 1958, thus beginning its organizational drive of the the Greenville terminal of the Overnite Transportation Company, one of that company's 28 terminals in southeastern United States. Responding to the union's efforts, 20 of the warehousemen, almost the entire night shift, joined by June 28, and before the middle of July six out of 35 drivers had joined. Between June 30 and July 8, the company fired 15 of the 20 night-shift warehousemen adhering to the union, and in the following months three of the union drivers. The examiner, later upheld by the Labor Board, found all of these discharges discriminatory in violation of sections 8(a) (3) and 8(a) (1) of the National Labor Relations Act, and recommended that each be reinstated with back pay.

The actions of the company's management which the examiner found to be violative of section 8(a) (1), along with convincing evidence of the company's general hostility toward the union, serve as background against which the discharges must be viewed. A. M. Price, the general manager in charge of all of the company's terminals, testified that the company was opposed to the union. He made it a practice to deliver a speech each year at every terminal restating the company's opposition. The managers of the Greenville terminal, having just learned of the union's organizational drive, became alarmed, and at their instigation Price delivered an additional speech on July 2, 1958, to the Greenville employees, reiterating the company's determination to "oppose this Union by every proper and legal means that we can devise." In addition, there was testimony, strenuously contested, that almost a year earlier, Terminal Agent Watkins,

1. National Labor Relations Act § 8(a) (3), 29 U.S.C.A. § 158(a) (3) (1956).

in charge of the Greenville terminal, told the men in a speech that he would close rather than permit the company to be unionized, and that he would find pretexts for firing those joining the union. Watkins himself admitted that he told every new employee that the company "has never been Union, and we don't intend to be Union as long as we can keep the Union out by all legal and proper means." These speeches, while not made the basis of findings of section 8(a) (1) violations, reveal the company's hostility towards the union.

As to the means pursued by the company in combating the union, the examiner found a number of specific section 8(a) (1) violations. The company managers interrogated employees about their union membership and about the identity of others who had joined. They threatened some with prompt dismissal if they did not resign from the union. These findings of section 8(a) (1) violations, more fully set out in the examiner's report, were sustained by the Board and are not attacked by the company here.

### Byers, Christopher, Smith, and Dunn

■ We proceed now to the alleged discriminatory discharges. The record does not reveal that the company knew about the union's membership drive until the morning of Monday, June 30. One Frank Saunders, apparently a tire salesman in Greenville, told Watkins that morning that the union was organizing the terminal and that a friend of his, H. C. Jamison, an employee on the night shift, had received threats of bodily harm if he refused to join the union. Immediately Watkins summoned Baldwin, a night-shift warehouseman, from his home. While there are conflicting versions of the ensuing interview, it is undisputed that, in the presence of Watkins and Terminal Manager Brown (immediately below Watkins in the chain of command) and Personnel Director Marks, Baldwin disclosed the names of many of the men who had recently joined the union. Included were the names of four men fired in the evening of the same day.

At the beginning of the night shift on June 30, Byers, Christopher, and Smith, all union members, were summoned to the office of Terminal Manager Brown and told that they were being laid off because of "slack freight." Two hours later, another night-shift warehouseman, Dunn, was called to the office of Terminal Agent Watkins and told that he was fired for the same reason. The examiner discounted the reason assigned for these discharges, and we find ample evidence to support his conclusion. The tonnage of freight handled by the Greenville terminal increased considerably from over 8,700,000 tons in June to over 10,400,000 tons in July, and the company had late in June hired four additional warehousemen to work on the night shift.

In its brief and in oral argument, the company pressed the claim that the four warehousemen had been marked for discharge before the company learned about the union organizational drive. Its officials testified that they had been investigating the causes for the excessive loading errors at the Greenville terminal and had decided to replace the inefficient night shift in its entirety. It is claimed that the four new warehousemen were hired as replacements. However, we do not think that the company's evidence is such as to preclude the finding by the examiner, adopted by the Board, that the employees had been discharged because of union activities. Not only was there evidence, as we have seen, of hostility to the union, but the fact that the discharges followed so swiftly upon Baldwin's revelations strongly indicates that the company's alleged long-term plan to improve the efficiency of the Greenville operations was not the reason for the discharge of these union members. The company evidently believed this a "proper and legal means" of opposing the union. Furthermore, some doubt is cast upon the existence of the improvement program itself by Price's July 2 Greenville speech in which, referring to a recent pay raise, he told the men that they "had earned it."

Heretofore we have stated the governing legal principles:

"Union membership or activity does not insulate an employee against the hazards of unemployment due to lack of work or any other reason related to the legitimate management of the business. [Citations omitted]. On the other hand, economic reasons may not be asserted to shield an employer against the consequences of his discrimination against an employee who would not have been laid off but for his union activities or membership. [Citations omitted]. The circumstances of each case must be weighed to determine what motivations truly dominated the employer in laying off or discharging the employee." N. L. R. B. v. Jones Sausage Co., 257 F.2d 878, 881–82 (4th Cir. 1958).

On the facts pertaining to these four men, we must uphold "the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); see N. L. R. B. v. Walton Mfg. Co., 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed. 2d 829 (1962).

### Cheek, Thompkins, Knight, Steading, and Robinson

■ On the following evening, July 1, the company discharged five more night-shift warehousemen who had joined the union, again assigning "slack freight" as the reason Cheek, Thompkins, Knight, and Steading had been identified as union members by Baldwin the previous day. He could not recall whether he had also included Robinson in identifying union members. However, Brown, in his testimony, mentioned a Robinson, without specifying a first name, as among those so identified, and Watkins did not deny that he knew of Robinson's union membership. As in the case of the four fired the previous evening, and for the same reasons, the examiner could justifiably find that these employees were really discharged because they had joined the union, and not, as the company contends, as a part of a plan, conceived before the union activities began, to improve the Greenville terminal's poor loading performance, nor because there was a decrease in freight.

### McKittrick

■ On the whole record we fail to find substantial evidence to support the examiner's conclusion that Watkins and Brown discharged McKittrick on Tuesday morning, July 1, for union membership. The evidence reveals plausible, nondiscriminatory reasons for his discharge. McKittrick worked part of the week with the night shift as a switcher and yardman, but on Saturdays and Sundays he worked during the day, washing trucks and checking their gas and oil. As to the reason for discharging McKittrick, Watkins testified that, on the preceding Saturday, June 28, he had been unable to find him from seven until sometime after nine in the morning and had to leave instructions intended for him with another employee. McKittrick's testimony is not completely contradictory. His version was that, while he had been continuously on the job from seven o'clock, he made a brief visit to the loading platform, 200 feet from the area where he was supposed to be working. Moreover, Watkins had twice before been about to discharge McKittrick, once when he was still a driver, for improperly delivering freight, and once when McKittrick was reported to have left work for several hours at a time on a number of nights. While because of Brown's intercessions on his behalf, McKittrick was not discharged on these occasions, these earlier incidents do suggest that further misconduct by the employee would justifiably dispose Watkins to fire him.

More importantly, the evidence fails to show with any clarity that the company knew or had reason to suspect that McKittrick was a union adherent when the decision to discharge him was reach-

ed. Almost the first thing on the Monday morning following the Saturday incident, Watkins told Brown that McKittrick would have to be let go. It appears that this decision and this conversation were prior to Baldwin's revelation later that day of McKittrick's membership in the union. The fact that McKittrick's actual discharge did not happen until Tuesday morning is explainable by the circumstance that he was not scheduled to report for work until nine o'clock Monday evening, later than Brown's and Watkins' usual hour of departure. The examiner placed heavy reliance upon McKittrick's testimony, denied by Brown, that, when almost two months later, he spoke to Brown about the possibility of reinstatement, Brown remarked that "I would have to forget about the union, there weren't going to be [a] union." However, this statement is no proof that Watkins knew McKittrick was a union member when he decided to dismiss him.

### Summeral

■ Summeral who worked on the night shift, was discharged by Watkins on the evening of July 2. The company does not contend that there is not substantial evidence to support the finding that his discharge was dicriminatory in violation of section 8(a) (3) for refusing to resign his union membership. Rather, the company argues that Summeral was a supervisor within the meaning of section 2(11) so as to fall outside of the protection of section 8(a).

The examiner relied on the fact that no evidence showed that Summeral ever exercised an independent power to hire or discharge employees. The company cites an isolated instance where Summeral was responsible for the firing of a drunk dockhand, but the evidence is clear that he not only first requested permission from the dispatcher, Adair, who was admittedly the supervisor then in charge, but that he also told the offender in Adair's name that he was fired. The examiner stressed additionally that most supervisors were salaried and generally worked a five-day week, while Summeral was paid by the hour and worked a six-day week; that while Summeral occasionally was left in charge of the terminal on Sunday nights, on other Sundays he took his orders from a rank-and-file employee; that the employees did not consider him a supervisor; and finally that, since his discharge, his job had been filled by a rank-and-file dockhand.

The company, on the other hand, asserts that Summeral did responsible work, but we do not find this evidence sufficient to require a finding that Summeral was "a supervisor who shares the power of management." N. L. R. B. v. Southern Bleachery & Print Works, 257 F.2d 235, 239 (4th Cir. 1959). The company argues that at the time Summeral was released, he handled the bills of lading and lined up the work of loading the trucks. He also aided in checking the freight. However, checking freight as it leaves the terminal is a routine job, not involving the exercise of independent judgment. And while it requires intelligence to line up the work, accomplished by arranging the bills of lading so that freight scheduled to be unloaded from the truck first will be loaded on last and be near the door and vice versa, the job does not rise to the level of a supervisor's duties.

The company emphasizes that some Sunday nights Summeral was left in charge of the terminal. The significance that can be attached to this, however, is limited by the fact that on these nights activities at the terminal were more restricted than on other nights. Fewer employees were then on the job, the only work being to load the pickup trucks for local deliveries. Finally, the company says that in his previous job with the company, at twenty-two cents less per hour, Summeral was in charge of loading during the night shift. Nevertheless, as we have seen, Summeral was without authority to hire or fire and received the same hourly wage as when he was a regular dockhand. Significantly, after Summeral vacated that job there was a realignment of work and duties, and the person who took over after him was in-

vested with specific authority, denied Summeral, in respect to hiring and firing, and was put on a salary rather than on an hourly wage like Summeral. On this evidence, we feel that there was a rational basis in fact for the examiner's conclusion that Summeral was not a supervisor in his earlier job or when he was dismissed.

### Watson, Baldwin, Blanken, and William McCombs

The next episode occurred on the evening of July 3, when Watkins discharged four night-shift warehousemen. Seven or eight times during the preceding days, these men, Watson, Baldwin, Blanken, and William McCombs, as a group discussed the union for brief periods of time but during work hours with Robert L. Brown, one of the few warehousemen on the night shift who never joined the union. Brown reported their activities to Supervisor Noles and to Terminal Manager Brown, who promptly told Watkins, but no warnings were issued to the men. Finally, on the evening of July 3, when they persisted in their efforts with Robert Brown, he complained to Watkins himself that they "bothered" him. That same evening Watkins terminated their employment, stating that it was against the company rules to interfere with another man's work.

■■ The examiner found that these men were discharged because they had discussed union membership with Brown and not because they had interfered with his work, neglected their work, or violated a company rule. We think that the examiner was justified in this conclusion. While it is true that the uncontested evidence establishes that the men a number of times corralled Brown during working hours to induce him to join the union, each incident was of short duration only, from two to five minutes. If there was any interference with Brown's work at all, it was slight, certainly not so serious as to justify the wholesale dismissal of four employees. Neither Watkins nor any other company manager testified that any other employees had ever been disciplined for violating the company's rule against interfering with another employee's work. Moreover, these men were not rebuked or admonished at the time by management personnel, despite Brown's repeated complaints to them. From this it seems most unlikely that the men would have been dealt with so severely had they not been union activists and had the union not been the subject of their discussions with Brown. While the company had the right to enforce reasonable rules to maintain discipline during working hours, see Republic Aviation Corp. v. N. L. R. B., 324 U.S. 793, 803 n. 10, 65 S.Ct. 982, 89 L.Ed. 1372 (1945), it may not distort those rules to club a union which is attempting to organize the employees. See N. L. R. B. v. Bradford Dyeing Ass'n, 310 U.S. 318, 330–333, 60 S.Ct. 918, 84 L.Ed. 122 (1940).

### John McCombs

■ John McCombs, one of the union drivers, was dismissed on Monday, July 7, ostensibly for not reporting for work on Saturday, June 21. McCombs admitted his absence on that day and that he had the preceding year similarly failed to work on Saturdays, for which he had been disciplined. He also testified, however, that when he reported for work the Monday following his unexcused absence, and throughout the week, no one ever mentioned this. Then the following week, he was on vacation. Upon returning to work Monday morning, July 7, he testified that he was called into Watkins' office, questioned about his union membership, and told that Watkins would draft for him a letter of resignation from the union which he would have to sign if he wanted to keep his job. Watkins at first offered to allow him a day to decide whether he would withdraw from the union, but Watkins, apparently changing his mind, then fired him on the spot.

The company, for its part, offered the testimony of Watkins who denied ever speaking to McCombs about the union and asserted, contrary to McCombs, that

the Saturday that McCombs missed was to have been his last work day before his vacation. Consequently, it is argued, there was no opportunity before July 7 to speak to McCombs about his absenteeism on Saturday, June 21, nor could Watkins have fired him before July 7. This explanation, submitted by the company, is directly contradicted by the testimony of McCombs' supervisor, Adams, and by the company's own exhibit, prepared by the payroll clerk under Watkins' supervision, which lists all the terminations at the Greenville terminal. This document corroborates McCombs' testimony that he did not leave on his vacation immediately after Saturday, June 21, but that he completed a full week's work thereafter. It establishes clearly the examiner's finding that the absence on Saturday, June 21, was not the cause of McCombs' discharge.

### Cassell

■ Cassell, a part-time dockhand, was discharged when he reported for work in the late afternoon of July 8. The examiner found that it was because of his union membership, while the company contends that it was because the previous day he had failed to telephone on time that he would not be able to work. The facts are that in the early afternoon of July 7, the day before Cassell's dismissal, he had to take his wife to the hospital for an emergency operation. He testified that he did not telephone the terminal at five o'clock in the afternoon when he was due to report for work, but waited until he returned home from the hospital at 8:30 in the evening. Supervisor Aultman was not available, but the employee who received the call agreed to relay Cassell's message. Cassell called a second time at nine o'clock and this time spoke to Aultman who accepted Cassell's excuse and said that he would tell Supervisor Noles, who was in charge of the terminal during the night shift. All of this evidence was undisputed except that Aultman denied talking to Cassell that evening, which denial the examiner expressly disbelieved.

The company contends that Cassell was discharged in accordance with its regular practice, about which Watkins testified, of discharging employees who report for work late without calling in advance. The company insists that the Board failed to meet its burden of proving that this rule was not universally applied. However, we find sufficient contradictory evidence on the record to meet the company's claim of such rigidity in enforcement. Aultman's statement to Cassell over the telephone that he had a legitimate excuse suggests that the rule was not as inflexible as is now contended. In addition, as we saw in considering the case of John McCombs, the rule was not inexorably enforced.

Moreover, there is substantial evidence to support the examiner's finding of discrimination specifically aimed at Cassell. He testified that on June 30 he was summoned to Watkins' office where, in the presence of Personnel Director Marks, he was asked who had solicited his union membership and why he had joined. Two days before he was dismissed, he was again interrogated. Watkins threatened him with discharge because of "slack freight," suggested that he write a letter of resignation from the union, and told him that he had until the next day to think it over. Cassell also testified that, on July 8 when he was discharged, Watkins listened to his reasons for not reporting for work but gave him no opportunity to say when he had telephoned in and to whom he had talked.. Watkins denied Cassell's testimony in almost every detail except, significantly, he admitted having asked Cassell to reveal who had solicited his union membership. The examiner could reasonably choose to disbelieve Watkins' explanations.

### Finley

■ Finley, a union driver, was discharged on September 2, nearly two months after the last of the series of discharges hereinabove recited. To support the finding that his discharge was discriminatory, the examiner points to four separate instances in which Watkins

interrogated Finley about union matters. These need only be related in barest outline to show that the company knew of Finley's union affiliations. On July 1, the day before Finley actually joined the union, Watkins summoned him from his home and, in the presence of Personnel Director Marks, questioned him as to whether he belonged to the union. Twice on July 25 Finley was interrogated by Watkins at which time Finley revealed his union membership. Again, toward the end of August, he was asked whether he had given any statement to the Labor Board with respect to the union's attempts to organize the Greenville terminal and replied that he had.

The company, on the other hand, contends that Finley was discharged on September 2 for violating a company rule forbidding a driver to operate his truck either in excess of the posted speed limit or over 50 miles per hour. Marks testified that he was driving to Atlanta when an Overnite truck passed him going in the opposite direction. As it was part of Marks' job to enforce the company's safety rules, he turned around and followed the truck in accordance with his usual practice. By driving approximately the same speed as the truck, and checking his special speedometer, the same kind as is used by police, Marks found that the truck went 45 miles per hour in a 35 mile per hour zone and then 55 miles per hour on a long down-grade on the open road. At the bottom of this hill, Marks observed that the Overnite truck pulled behind another truck (a piece of road machinery, Finley testified), and followed it very closely. Marks passed both vehicles, pulled to the side of the road, and stopped the Overnite truck as it approached. He then recognized the driver to be Finley. He told Finley that he had been speeding and to report back to Watkins when his trip was over. Marks then drove to Greenville and told Watkins to fire Finley which Watkins promptly did upon Finley's return. Marks also testified, and was corroborated by Finley, that the company rule with respect to speeding was well known by the men and strictly enforced by him. He had two assistants whose primary duty was to aid him in patrolling the roads, looking for speeding and other safety violations, and he gave the names of several drivers whom he had recently discharged for speeding.

The examiner discredited this testimony of Marks, not because it was contradicted, but because, having heard Marks testify as to other matters, the examiner believed that he was not trustworthy. See N. L. R. B. v. Pittsburgh S. S. Co., 337 U.S. 656, 659, 69 S.Ct. 1283, 93 L.Ed. 1602 (1949). Thus, the examiner found no credible evidence that Finley had been actually speeding and so concluded that he was discharged because of his union activities.

In reviewing this record, we think that the examiner was in error in finding no credible evidence as to Finley's speeding, for Finley's own testimony lends support to the speeding charges against him, rather than clearing him of them. Finley admitted on the stand being stopped by Marks, but denied that he had in fact been speeding. As to the charge of speeding in the 35 mile per hour zone, Finley testified that, although he could not remember his exact speed, he could not have been going 45 miles per hour, for the speed zone is on a small upgrade with a traffic light at the crest, "and nine times out of ten you have to stop at that red light." However, Finley admitted that he did not have to stop for the light in this particular instance, and, as it was his first trip on that run, he could not then have known that he would usually have to stop there. As to going 55 miles per hour, Finley testified that he had checked his speedometer when he recognized that it was Marks driving the car which passed him, and that the speedometer read only 50. However, Finley also testified that he had gotten stuck behind a slow moving vehicle, and if so he could hardly have been traveling even at 50 miles per hour when Marks passed.

We recognize the extreme caution with which a reviewing court must approach an examiner's resolution of issues of

credibility. Nevertheless, we think that here "the record * * * clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses * * *." Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 490, 71 S.Ct. 456, 465, 95 L. Ed. 456 (1951). The credibility of Marks is not the sole basis for the company's claim that Finley was speeding, for Finley himself supplies facts strongly corroborating the claim. The examiner seems not to have taken into account the intrinsic contradictions in Finley's testimony. We find that the evidence as a whole unmistakably points to the conclusion that Finley was speeding and consequently that Finley was discharged for violating the strictly enforced company rule on speeding.

### Greer

■ Greer, a driver and a union member, was the last employee at the Greenville terminal whom the examiner found to have been discriminatorily discharged. Greer had a poor work record. Several months before his discharge on January 30, 1959, he apparently caused an accident with his truck. Later, he again violated company rules by delivering freight without obtaining the consignee's signature on the bill of lading. As a disciplinary measure, he was laid off one week for each violation, but was not permanently discharged. Then Greer was subpoenaed to testify on January 21, 1959, at the Labor Board hearings on charges against Overnite of unfair labor practices in respect to the matters treated earlier in this opinion. Despite sufficient time, Greer neglected to tell his supervisor, Adair, that he would be unable to work that day, and this caused the company to miss some deliveries. When Greer reported for work the following day, Adair warned him that he would be discharged for his next infraction, and informed Watkins of this.

On January 30, Greer and Wright were inside a trailer unloading it. While there is a dispute as to who started the conversation, both testified that they talked about the union for two or three minutes. There was no company rule forbidding talk during working hours, so long as it did not interfere with the work. Greer says that they continued working throughout the conversation, but Wright says that Greer stood between him and the freight, impeding the work. The foreman, Blake, observed the two men in conversation and reported it to Watkins who immediately summoned Wright for questioning. Wright told Watkins that the union was the subject matter of the discussion. On the stand, Watkins testified that Wright also told him that Greer interfered with his work, but Wright denies saying this to Watkins. Watkins next summoned all the men then on duty, in their presence questioned Greer about his conversation with Wright, received what to him seemed unsatisfactory replies, and fired Greer on the spot.

Certainly, any one of Greer's prior acts of misconduct would have provided ample cause for his discharge when the acts were done. But as in the case of John McCombs, the company may not rely upon earlier misconduct as the ground for effecting a discharge substantially later when there is no showing of any significant misconduct immediately preceding the discharge. Nor is it material that the examiner found no section 8(a) (4) violation: the examiner specifically found that Greer was dismissed, not for his role in the Labor Board hearings, but for his union activities. The events of January 30 sufficiently support the examiner's finding of discrimination. Before dismissing Greer, Watkins was at pains to ascertain that the union was the subject of the latter's conversation with Wright. The interference with Wright's work, if any, was minimal. And the manner of questioning Greer in the presence of the entire work crew is a circumstance strongly suggesting that Watkins was intent on making an example of Greer, to show the other workers what would happen to them if they advocated the union.

## II. COLUMBIA TERMINAL

*John Calcutt, William Calcutt,
Harmon, and Laney*

The Board requests enforcement of its order for the reinstatement of four men, John Calcutt, William Calcutt, Harmon, and Laney, employed at Overnite's Columbia terminal, who were found to have been discriminatorily discharged on July 8, 1959, in violation of sections 8(a) (3) and 8(a) (1). The examiner's conclusions rest upon the dovetailing of two types of evidence. First is the undisputed evidence of the company's opposition to the union. In addition to the testimony with respect to the discharges at the Greenville and Charlotte terminals, Carter, the terminal manager at Columbia, testified that it was his regular practice, shortly after a new man was hired, to inform him about the company's policy of "legal" opposition to the union. A former employee, Odom, testified that in February, 1958, months before the union organization drive involved here, he was questioned by Carter's lieutenant, Roberts, as to whether anybody in the terminal was talking union and who they were. According to Odom, when he denied having heard any union talk, Roberts told him that if he "heard anybody talk about the union for [Odom] to let [Roberts] know, and he would discharge them immediately."

An important element in support of the examiner's findings of discrimination is the close proximity in time of the company's learning about the union membership drive and who had joined, with the discharge of the four men. John Calcutt testified that between 7:15 and 7:30 in the evening of July 7 he and several other men, including the three who were discharged with him, were talking outside the union hall which was over a beer saloon on a main street in Columbia. A car, driven by Carter with Personnel Director Marks sharing the front seat, slowly passed them. Shortly thereafter, the same car drove past the union hall in the opposite direction. Both times, Carter and Marks were observed carefully looking at the assembled men. Harmon and Laney corroborated Calcutt's testimony. Mrs. Laney testified that, after the men had gone inside, she was in the front seat of Laney's automobile when a car with three men parked in front of her. She saw Carter get out and try to look into the union hall. He noticed Mrs. Laney, was heard to remark about this, and drive off. Carter, for his part, denied surveillance of the union meeting, but in view of the ample contradictory evidence, the examiner was justified in discounting his testimony.

Employee Ellisor testified that the following morning, July 8, Carter questioned him about his union membership and that during the course of the discussion Carter indicated that he knew who were union members. Carter himself admitted that Roberts had that morning informed him of the union membership drive, and that Ellisor had come to his office to withdraw from the union. But Carter denied knowing that the four he discharged that same morning were union members. The evidence, including that pertaining to surveillance, however, is substantial to support the examiner's conclusion that Carter knew who were the union men, and that they were discharged because of their union activities.

As to each, the company assigns a legitimate reason for his discharge. However, given our limited scope of review and the principles stated in the Jones Sausage case, we do not find that in any of the cases the evidence is such as to warrant reversal of the conclusions of the examiner and the Board.

Driver John Calcutt was deprived of his job, according to Carter, because "he wasn't worth a darn." It is true that in May he had failed to report a minor accident, costing Calcutt $12.50 and the company $3.00, and that a few weeks later, he was taken off the Sumter route and put on local deliveries because he had been "killing time"—a twenty-minute break for a coca-cola. Nevertheless, according to the credible testimony, the company did not release him from his

job until after it learned of his union membership, three to five weeks later. Shortly before he was let out, Roberts told Calcutt that he was too slow in making his deliveries, but added that things would get better when he learned his way around the city, thereby indicating that there had been no plan to discharge Calcutt before finding out that he was a union adherent. On these facts, the examiner could reasonably find that the asserted reason was merely a pretext.

According to the company, the employment of Harmon, a pickup driver, was terminated because he was a poor worker. In addition to over-all inefficiency, the company points to two specific violations of company rules: several weeks earlier he failed to report that he had backed his truck into a consignee's shed, damaging a shingle, and the day before his dismissal he helped another trucker load up without radioing the dispatcher that he would be "off the radio" for twenty minutes. This is an instance of two conflicting contentions of the reason for a man's discharge, each supported by some evidence in the record. The general testimony above outlined could be taken into account by the examiner in weighing the two versions. In the existing circumstances, the examiner's choice cannot be upset.

The company contends that the reason for Laney's discharge was that his serious domestic troubles, including his wife's causing him to be locked in jail overnight for nonsupport, interfered with his work and made him lose interest in it. But his domestic troubles were at their height a month before his discharge and do not explain his not being dealt with until the day after his union membership was discovered.

Finally, William Calcutt, brother of John, was discharged for griping to other employees about pay and working conditions. Admittedly, he was one of the terminal's better drivers and his complaints were not made the subject of any admonition by the employer for a month or more before the discovery of his union membership. The examiner was within

bounds in finding that Calcutt had been discriminatorily discharged.

III. CHARLOTTE TERMINAL

The union renewed its organizational activities in the Charlotte terminal in June, 1958. As at Greenville and Columbia, the company's opposition to the union is amply established. There was testimony to the effect that Terminal Manager Vigue warned every new employee about the risks he would assume in joining the union. Further, in July, Vigue told the assembled drivers that a union would not be tolerated. General Manager Price gave the Charlotte drivers one of his "routine" anti-union speeches in October or November. Earlier, in July, Price had interrogated Driver Harold Clegg to test his suspicions that Clegg was actively working for the union and threatened him with discharge should it be found that he was a union member.

The examiner found that the company between October 23 and December 1 discriminatorily discharged seven Charlotte employees, all of whom had joined the union early in October. The company attempted to justify all of these discharges, except one, as part of a general reduction of the payroll in order to cut labor costs to match the seasonal decrease in freight handled in November and December. In fact, thirty employees went off the payroll at the Charlotte terminal in the months of October, November, and December. Of these twenty-four were discharged or laid off. It is noteworthy, however, that of the seven pickup and delivery drivers discharged during this period, six were employees found by the examiner to have been discriminatorily discharged.

With this background, it is necessary to examine more particularly the individual cases.

### Clegg

██ We fail to find substantial evidence to support the examiner's conclusion that the company discriminatorily discharged Harley Clegg, the father of Harold Clegg who is mentioned above as having been interrogated by Price. The

company's asserted reason for discharging the elder Clegg has evidentiary support. Clegg spent part of his time doing essentially janitorial duties and part of his time working on the dock. After his discharge on October 23 for "lack of work," nobody was hired to do the maintenance work he had formerly done. While just before his discharge part-time dockhands were hired, these men worked only at peak hours, for two or three hours in the early evening when there was need on the dock for a short period of an increased number of workers, but no need to add to the number of full-time workers.

The meagre evidence to support a finding that Clegg was discharged because of union membership is not only disputed, but unconvincing. As Clegg was leaving the terminal after being laid off, he spied Price and hailed him. Price had in the past been kind to him, permitting him to be employed while on parole from a life sentence imposed after four felony convictions. Clegg told Price that he had been laid off, and Price, although sympathetic, said that some lay-offs were necessary and that the least important jobs were going first. Clegg then asked whether the union had something to do with his being fired. According to his version, Price replied that Clegg had been talking union since he first started working for the company, and the company would not stand for it. This is not enough to show that Clegg was discriminatorily discharged by Terminal Manager Vigue. Moreover the statement attributed to Price contains an inherent inconsistency. Given the union's unceasing organizational activities, and the company's continuous opposition, it does not seem reasonably inferable that the company would have tolerated Clegg if it knew that he was a union activist for the five years that he worked for Overnite. And Price testified that his answer to Clegg's question was that he was not concerned with the union's present membership drive, since the union had been active in the Charlotte terminal for fifteen years. Moreover, there is no other evidence that the company knew Harley Clegg to be a union member. The examiner's finding that the company must have known this because his son was an active union member, has little support in the circumstances of this case. The son had voluntarily quit the company two months before the elder Clegg joined the union, and, according to the examiner's findings, Harley Clegg did not join until about 15 or 20 days before his discharge.

### McNeil, Walter McClure, and John McClure

The company discharged three drivers, McNeil, Walter McClure, and John McClure between October 24 and 27. The examiner found that they were let out "because of their union membership and activities and/or because Respondent attributed such activities to them" and that therefore their discharges violated sections 8(a) (3) and 8(a) (1). We find no substantial evidence on the record as a whole to support this conclusion.

As we have seen, the record supports the company's economic justifications for laying off some men from late in October through December. It is true that the company was hiring new drivers as late as the first week in October, but the freight was particularly heavy then. In January, when business picked up after the November-December slack period, Walter McClure was recalled and even granted a raise, and there is evidence that Marks at about the same time attempted to contact John McClure to offer him a job. As to laying off these drivers and not other, possibly non-union, drivers, there is sufficient evidence of non-discriminatory reasons for the selection of at least two of them. McNeil was not a particularly good worker as evidenced by the company's failing to give him a pay raise when most other drivers got one, and later, when he protested, giving him 3¢ per hour, the minimum raise, as compared to 8¢ received by some other employees. John McClure had not been cooperative in accepting his share of overtime work in the beginning of October when the freight was heavy. And,

while there is no testimony as to why Walter McClure was selected for lay-off, it is noteworthy that he had been working only since September 1.

■■ The examiner's conclusion that these discharges were discriminatory could be accepted despite the asserted economic justifications if there were proof that the men were laid off because they belonged to the union. However, there is no direct evidence in the record that the company knew or had reason to suspect that they had joined the union less than a month before they were discharged. And the only circumstantial evidence bearing on this point is that both Walter and John McClure were questioned when they were hired about their attitudes toward the union. Both replied that they were not members. While this evidence tends to show the company's general hostility toward the union—a fact sufficiently established without this further evidence—it is no proof that the company knew or suspected them of joining the union while in Overnite's employ. Unlike the cases recounted earlier in this opinion, there is no evidence as to these men of interrogation after they began work, or of surveillance. Standing alone, proof of a company's general anti-union policy will ordinarily not suffice to support a conclusion that a particular employee was discriminatorily discharged absent direct or circumstantial evidence that the company knew or had reason to suspect him of union membership. See N. L. R. B. v. J. Mitchko, Inc., 284 F.2d 573, 575 (3d Cir. 1960); N. L. R. B. v. Cosco Prods. Co., 280 F.2d 905, 909 (5th Cir. 1960); N. L. R. B. v. Sebastopol Apple Growers Union, 269 F.2d 705, 713 (9th Cir. 1959). No such showing can be found in the record as to these three men.

### Hutchinson

■ Driver Hutchinson was discharged on October 31. As before noted, the company has established that economic conditions necessitated some lay-offs. Hutchinson was selected for lay-off, Marks asserted at the hearing, because he was doing poor work. The only evidence supporting this assertion is that two weeks before his discharge, Hutchinson received a raise of only 3¢ per hour. This evidence is equivocal, for while some drivers were given as much as 8¢, others were not given any raise. Furthermore, in direct contradiction, Hutchinson testified that a week before he was discharged, Marks complimented his work.

Not only is the company's reason for the discharge doubtful, but, unlike the cases of McNeil, Walter McClure, and John McClure, there is as to Hutchinson ample specific evidence that the company was keeping a close watch on him with respect to his attitude toward the union. Hutchinson testified that a week before he was discharged, Marks, after praising his work, sternly warned him that the company would not tolerate the union and could make reasons for discharging a union man. Hutchinson had denied that he was a member but admitted to Marks that he had been contacted on behalf of the union by other drivers. The examiner did not credit Marks' denials of this conversation, and we have no basis on which to upset the examiner's finding of credibility. Hutchinson testified further that immediately after leaving Marks' office, Supervisor Lail told him that Marks and Price were satisfied that he did not belong to the union. And on October 26, five days before his discharge, Lail told him that Price was considering him as a possible supervisor, but did not know exactly what were his feelings about the union. Hutchinson also testified that he joined the union a week before his discharge. After joining, he discussed the union with other employees, sometimes on the company's premises, although never during working hours. From this evidence of the close attention that was paid to Hutchinson's attitude toward the union, plus the evidence that Hutchinson openly discussed the union with employees, the examiner had a substantial basis for his inference that the company learned of Hutchinson's union membership and laid him off for that reason.

### Stamey

[16] The stated reason for the layoff of the driver Stamey on November 28 was that his run was being discontinued. The evidence is undisputed that Stamey and another driver covered essentially the same territory and that, due to the reduction in freight, the two runs were consolidated and have never since been separated. Nevertheless, we find substantial evidence for the examiner's conclusion that Stamey, and not the other driver, was picked to be laid off, because of Stamey's union membership.

He joined the union a few days before his lay-off. On November 28, he was called into Marks' office. According to Stamey's testimony, Marks first questioned him about his having failed to mention on his job application, filled out over a year before, a particular prior employer, Associated Transport, which had a union shop. Then Marks inquired whether he knew Ed Hargett, a former employee of Associated Transport, and now president of a Teamsters Union local. When Stamey admitted that they were good friends, Marks became angry and told him that he was fired, that even though he did a good job the company did not like anyone connected with the union, that they were discontinuing his run anyway, and "that there were two reasons why a man would be discharged from Overnite * * * by either having an accident or for union activities, and I hadn't had any accidents." The examiner could conclude that Marks interrogated Stamey to find out whether he was active in the union to assist him in deciding whom to let out in effecting necessary reductions in the work force.

The company relies on Marks' testimony that he questioned Stamey about the omissions on his application several months before he was laid off, and that he had never spoken to Stamey about union activities. Moreover, the company points to the undisputed evidence that it knew when it hired Stamey that he had earlier worked for the Carolina Motor Express Company, a unionized company.

Nonetheless, the examiner could disbelieve Marks' testimony and credit Stamey's with respect to the time and subject of the conversation between them, and the fact that the company knew of Stamey's union adherence when with a prior employer does not prove that it did not lay him off for his union membership while in Overnite's employ. We find that the examiner's conclusion was "justified by a fair estimate of the worth of the testimony of [the] witnesses." Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 490, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951).

### Wayne McClure

The case of Wayne McClure is another in which the examiner's resolution of conflicting testimony, and consequently his conclusion, must be permitted to stand. McClure, a driver since April, was questioned on October 30 by Marks as to whether he had broken company rules by taking two hours for lunch without radioing the dispatcher and leaving his truck unattended and out of his sight. According to McClure's testimony, Marks twice asked whether McClure had signed a union card, and was twice told no. Marks denied that part of the conversation. McClure was discharged on December 1, according to the discharge sheet, for unsatisfactory work and for having left his truck unattended, and not because work was lacking. However, there is scant evidence in the record as to how his work was unsatisfactory, and the examiner might well discredit the truck incident as the genuine reason for discharge, despite inconsistencies in McClure's testimony, since the incident occurred a month earlier and no action was then taken. In light of the examiner's finding that McClure was interrogated about his union membership, the examiner could reasonably conclude that Marks knew or suspected that McClure was a union member and discharged him for that reason.

The Board's petition for enforcement will be granted in part and denied in part in accordance with this opinion.