**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HECK'S INC., Respondent.**

No. 11062.

United States Court of Appeals
Fourth Circuit.

Argued April 6, 1967.

Decided Oct. 12, 1967.

Michael N. Sohn, Atty., N.L.R.B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Glen M. Bendixsen and Leon M. Kestenbaum, Attys., N.L.R.B., on brief), for petitioner.

Frederick F. Holroyd, Charleston, W. Va., for respondent.

Before BOREMAN, WINTER and CRAVEN, Circuit Judges.

WINTER, Circuit Judge:

Alleged unfair labor practices at the company's branch retail department store in Parkersburg, West Virginia resulted in a Board order finding violations of § 8(a) (1), (3) and (5) of the Act, 29 U.S.C.A. § 151 et seq., and requiring, *inter alia,* reinstatement and backpay to certain discharged employees and collective bargaining with the Food Store Employees Union, Local No. 347, Amalgamated Meat Cutters and Butcher Workmen of North America, AFL-CIO. The Board seeks enforcement of its order. The alleged violations arose out of a union organizational drive, which began in early October, 1964, and a demand for bargaining, made on or about October 23, 1964. We grant enforcement of those portions of the order dealing with the § 8(a) (1) and (3) violations and requiring backpay and reinstatement. Enforcement is denied, however, with regard to that portion of the order requiring collective bargaining.

### The § 8(a) (1) Violations

Shortly after the drive began, Darrell Ellis, concededly a supervisor, questioned Jerry Brethauer, an employee "who had signed." Ellis made clear that he knew of the attempt at unionization and the locations where meetings to that end had been held. Ellis subsequently told Brethauer that a union "wouldn't go" in the store and that if a union succeeded in organizing the employees the store would be moved to Huntington, West Virginia. Ellis then quoted the company's president, a Mr. Haddad, as saying that after "this whole business was over," he would fire "everybody that had signed up for the Union."

Ellis also warned another employee, on the same day, that "it is rough where there is a union." About ten days later, Ellis told the same employee that he knew of the union meeting that was held a week before, and also of seven employees who wanted to resign from the union, and would write letters to this effect to Haddad. This latter conversation was concluded by advice that the union would not be allowed to succeed, that there was a "legal" and a "dirty" way to keep the union out, and that the "dirty" way would be used if necessary.

On October 20, Ellis asked Calvin Shackelford, a third employee, if the latter had signed a card for the union. Ellis sought to find out the name of the person who had procured Shackelford's authorization and if Brethauer had influenced Shackelford to join the union. When Shackelford was reluctant to disclose why he had signed a union card, Ellis advised him not to worry

about Brethauer because Brethauer "was already in trouble." About a week later, Ellis informed Shackelford that the latter's chances for promotion would be better if he wrote Haddad a letter to the effect that he was sorry for getting involved with the union, and that he didn't want anything more to do with it. Ellis also asked another employee to write a letter to Haddad explaining that he "wanted out of the union."

The record discloses that Ellis was not the only company representative who made inquiries about the progress of unionization and statements tending to discourage the union's success. On October 20, Susan Lee, an employee, was called to the office of Billy Joe Hull, the manager of the Parkersburg store, and asked if she had attended a union meeting at the home of Ruie Perry. On the same day, Hull called another female employee to his office and informed her that he had fired two employees for solicitation on behalf of the union and that he could fire her for the same reason, but that he was not going to fire anyone else.

There was evidence also that, on November 3, a union representative, Woodrow Gunnoe, entered the Parkersburg store as a customer. His presence was immediately pointed out to the store manager and he was identified as "being from the union." Although the representative had not attempted to speak to any of the employees, the store manager communicated with Haddad and, after receiving instructions from the latter, told Gunnoe to leave. When Gunnoe protested that he "had bothered no one" the store manager threatened to call the police and to throw him out of the store. Gunnoe left of his own volition after the policeman the store manager summoned arrived at the store.

This short recitation of the more pointed evidence that the record contains manifestly discloses a substantial factual basis on which the Board could conclude that the company had violated § 8(a) (1) by interfering with, restraining and coercing employees in the exercise of their § 7 rights. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

### The § 8(a) (3) violations

Section 8(a) (3) violations were found to have been committed when Shirley Davis and John Brethauer were discharged, on October 20.

The record discloses that both were active in promoting the union. Shirley Davis signed an authorization card and attended several union meetings. Brethauer, in addition to signing a card and attending meetings, had solicited additional signatures, both at the store and at a lunchroom across the street. On October 20, both were called to the store manager's office. Davis was told "I suppose you know that anyone caught soliciting in the store or on the parking lot for a union will be fired [and] you were caught soliciting in the store and I know you have signed up at least two employees." Davis, who denied that she had solicited for the union, asked the store manager what he meant and she was told "to get out and stay out before he kicked [her] out." Brethauer was told "you are fired * * * not for signing a union card but for soliciting people at the store," and he was advised "to find out something about the law and go and get a job with * * * a union store." [1]

Had Davis and Brethauer been discharged for violating a valid no-solicitation rule designed to further valid production, order and distribution needs, applied without discrimination, their dis-

---

1. Additionally, two of the company's seven department heads were fired on October 31 and December 18, respectively, one after the company learned that he had attended a union meeting and the other after an employee reported that he had sat at the same table in a public res- taurant with a union representative. Although the trial examiner found that they had been discharged in violation of § 8 (a) (1) and (3), the Board concluded that they were supervisors and their discharge not in violation of either section.

charge would have been "for cause" under § 10(c) of the Act and not prohibited by § 8(a) (3). Wellington Mill Division, West Point Mfg. Co. v. N.L.R.B., 330 F.2d 579 (4 Cir. 1964); N.L.R.B. v. Empire Mfg. Corp., 260 F.2d 528 (4 Cir. 1959). See also, Republic Aviation Corp. v. N.L.R.B., 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945); Amalgamated Clothing Workers of America, AFL-CIO v. N.L.R.B., 124 U.S.App.D.C. 365, 365 F.2d 898 (1966). But it is well settled that enforcement of an otherwise valid rule only against those engaging in union activities is discriminatory. American Ship Bldg. Co. v. N.L.R.B., 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965); N.L.R.B. v. Overnite Transp. Co., 308 F.2d 284 (4 Cir. 1962). The Examiner and the Board concluded that arbitrary enforcement was present in the instant case. There is substantial evidence to support this finding, because of evidence tending to show that there never was such a rule prior to the discharges, or that it had not previously been enforced.

The store manager testified that, sometime in July, 1964, he placed a no-solicitation sign over the store cash register. This sign was not produced in evidence, and there was introduced into evidence only a copy of a sign evidently fresh from the printer. The only employee who was specifically asked about the sign testified that she had never seen it, even up to the time of the hearing. All employees who testified stated unequivocally that they had never been informed of a no-solicitation rule, and that the first time any such rule had been mentioned was after the discharge of Davis and Brethauer. A company-distributed booklet containing work rules made no mention of a no-solicitation rule, and there was evidence that solicitations for other than union matters had been tolerated on previous occasions.

As stated before, Mrs. Davis denied soliciting for the union. Significantly,

the record is barren of any proof to controvert her testimony. Taken as a whole, the record clearly supports the Board's conclusion that the discharges of Brethauer and Davis constituted violations of § 8(a) (3). Universal Camera Corp. v. N.L.R.B., supra.

*The § 8(a) (5) Violations*

On October 22, having obtained 37 authorization cards,[2] Sherwood Spencer, an official of the union, telephoned Hull, the store manager, and informed the latter that the union represented a majority of employees at the store and asked him if he would recognize and bargain with the union. Hull declined, but suggested that Spencer get in touch with Haddad, the company's president. When Spencer was unable to reach Haddad by telephone, Spencer wrote Haddad advising that the union represented a majority of the employees at the Parkersburg, West Virginia store, and requesting recognition for bargaining. In the letter Spencer also stated that he was prepared to deliver copies of applications for membership in the union, signed by a majority of the employees, at a time, place and date designated by Haddad.

Haddad did not reply to the letter, but in a telephone conversation, initiated by Haddad, concerning Gunnoe's appearance at the store, to which reference has been made, Spencer reminded Haddad about the union's letter asking for recognition and bargaining. Haddad responded that it was "a very nice letter" but that he was too busy to do anything about it until "after the holidays." There was no further communication from the company.

The company's store had 47 employees, in addition to the manager and assistant manager, and of these, 37 had signed authorization cards. The trial examiner determined by agreement of the parties, that a guard and an office clerical employee should not be included in the

2. The text of which was:
"The undersigned authorizes this Union to represent his or her interest in collective bargaining concerning wages, hours, and working conditions."

appropriate unit. The Board reduced the number further by excluding the manager and assistant manager, a guard, and 7 department heads, which the Board, in another proceeding concerning another of respondent's stores, concluded were supervisory employees (Heck's, Inc., 150 N.L.R.B. No. 143 (1965)). The Board made no definitive determination with regard to two other employees who were claimed to be temporary employees, but treated them, *arguendo*, as excluded. Thus, the Board determined that the appropriate unit was no more than 37 employees and no less than 35.

Of the 37 authorization cards the Board excluded those of the 5 of the 7 department heads who had signed, the card of a guard, the card of a clerical employee, 3 cards shown directly to have been solicited by department heads, and the cards of two employees who testified they were coerced into signing on the basis of threats to their job security. The Board declined to exclude the cards of 3 other employees as to whom offers of proof were made, and refused by the trial examiner, that they were signed under similar threats, and the cards of the 2 employees who were alleged to be temporary employees, but the Board noted that even if these 5 cards were also excluded the union would still possess a majority of at least 20 in a unit of 35 persons.

The Board found that the 5 department heads participated in varying degrees in the union's campaign. Indeed, the record shows that of 7 department heads, 5 signed authorizations, and of the 5, 2 procured the signing of some cards and one conducted an organizational meeting at her home, at which an undetermined number of authorizations were signed. The Board concluded, however, that the company's anti-union position was well known to employees and that the participation of the supervisory employees was not sufficient to "taint" the undisclosed number of cards signed at meetings held in their homes. To buttress this conclusion, the Board commented that the company did not deem the department heads to be supervisors until the Board's decision in the related case, and that there was no evidence that the employees regarded the department heads to be supervisors at the time of the union's campaign.

█ Unquestionably, the company refused to bargain, but a refusal to bargain on the part of the employer is not a violation of § 8(a) (5) when the "purported representative of his employees was not freely designated as such by the majority of his employees in the appropriate bargaining unit." N.L.R.B. v. H. Rohtstein & Co., 266 F.2d 407, 410 (1 Cir. 1959). Two elements must be present to render a refusal to bargain violative of § 8(a) (5), namely, that a majority of the appropriate bargaining unit has authorized the purported bargaining agent to act for them, and a bad faith refusal on the part of the employer to bargain. N.L.R.B. v. S. E. Nichols Co., 380 F.2d 438 (2 Cir. 1967); Amalgamated Clothing Workers of America v. N.L.R.B., supra; N.L.R.B. v. Richard W. Kaase Company, 346 F.2d 24 (6 Cir. 1965); N.L.R.B. v. Koehler, 328 F.2d 770 (7 Cir. 1964); and N.L.R.B. v. James Thompson & Co., 208 F.2d 743 (2 Cir. 1953). See also, United Molded Shapes, 141 N.L.R.B. 357, 359 (1963). That the employer was not aware that the alleged bargaining representative lacked a valid majority of the members of the unit is irrelevant if in fact the majority did not exist, because the employer's *bona fides* in refusing to bargain becomes a question only if a majority existed.

█ In the instant case, we do not reach the question of the company's *bona fides* in its refusal to bargain, because we conclude that the Board's determination that the union possessed a majority of at least 20 free and untrammeled authorizations in a unit of 35 is not supported by substantial evidence in this record taken as a whole.

The record is abundantly clear that an undetermined number of authorizations were obtained at meetings held in the home of an employee, subsequently determined to be a supervisory employee, at which substantial numbers of employees determined to be properly a member of the appropriate unit were present.[3] Moreover, the record shows that 2 of these supervisory employees otherwise played an active role in the campaign for unionization, by signing authorizations themselves and by procuring signatures at places other than their homes.

 It is no answer that the company's anti-union position was abundantly known to employees. The record shows that each of the department heads had authority to schedule daily work for his department, as well as the days off for employees assigned to it.[4] Such day to day authority over employees provided a basis for potential tyranny when improperly exercised by a supervisor thwarted in his aim to obtain union recognition, and an employee properly could doubt his ability to obtain protection by appeals to higher company authority. Employees who were subject to having their daily work schedules and days off assigned by such supervisors, and who were aware that department heads occupied a more exalted status than the employees, could, thus, well be influenced in their determination to sign a union authorization, irrespective of their knowledge of their employer's attitude toward the union, when requested to do so at meetings sponsored by their supervisors. We can only conclude on this record that the participation of the supervisors was sufficient to taint the drive for unionization and that, therefore, absent other proof of the voluntariness of each of the 20 authorizations, the record fails to disclose that the union represented the free and untrammeled choice of a majority of the employees comprising the unit.[5] Whether the employees thought of the department heads as "supervisors" is irrelevant, because they surely knew who

3. Woodrow Gunnoe, the organizer for Local No. 347, testified that the first organizational meeting was held at the home of Jerry Brethauer "around October 7," and the next meeting was "possibly the next night, or the night thereafter." When asked where this next meeting was held, he replied, "I had a meeting in Mrs. Barber's [an employee] house and I had a meeting in Mrs. Perry's [a supervisor] home."

Of 22 authorization cards offered and admitted in evidence at the instance of counsel for the Board, 6 were signed October 7, 1964, 7 were signed October 8, 1964 and 6 were signed October 9, 1964. If those signed October 8, or October 9, 1964, were in fact signed at the home of Mrs. Perry and are excluded, the union's apparent majority of 20 authorizations in a unit of 35–37 vanishes.

4. In determining them to be "supervisors," the Board also found that department heads receive higher salaries and bonuses than employees assigned to their departments, attend supervisory meetings, get preference for vacations, have access to sales figures and are responsible for the work of their department.

5. Additional support for this conclusion is found in the direct evidence that one supervisor—Mrs. Ruie Perry—obtained authorizations from four employees, and another—Betty Shepard—was responsible for at least two signatures besides her own. That some of these employees were later held ineligible, or their authorizations voided, does not detract from the persuasiveness of the proof that one supervisor took an active part in the procurement of authorizations over and above passive sponsorship of unionizing meetings. Significant also is the statement of one employee, whose authorization was apparently voided, in regard to the meeting held at a supervisor's home, "I was invited to Mrs. Perry's house and I knew nothing of what I was invited for until I got there; and they told me it was signed up practically solid, that if I didn't sign, it would be up to the employees of the store if I had a job, that they could vote me out and I had to work."

assigned them their daily work loads and who granted them days off.

International Union, United A., A. & A. Imp. Wkrs. v. N.L.R.B., 124 U.S. App.D.C. 215, 363 F.2d 702 (1966), and N.L.R.B. v. Majestic Weaving Co., 355 F.2d 854 (2 Cir. 1966), relied on by the Board do not compel a different result. In the *International Union* case, only 4 cards were shown to have been obtained by supervisors from over 110 persons comprising the appropriate unit. In the case at bar, 6 out of 37 cards were directly obtained by supervisors. More importantly, the record shows that the activities of the supervisors were not limited to these 6 authorizations.[6] In the *Majestic Weaving* case, it is clear that the alleged "supervisors" lacked the supervisory authority possessed by the department heads in this case.

Enforcement granted in part and denied in part.

CRAVEN, Circuit Judge (concurring and dissenting):

I concur in the decision of the court with respect to the § 8(a)(1) and § 8(a)(3) violations. I dissent from the court's refusal to accept as supported by substantial evidence the Board's determination of a violation of § 8(a)(5). I find it incredible that an employee of this anti-union company could doubt his ability to obtain protection from the tyranny of a union-sympathizing supervisor. Indeed, the record strongly suggests that an employee needed only to report to top management such a supervisor to secure the latter's dismissal. In any event, such questions, it seems to me, are for Board determination, and I would enforce the Board's order requiring the company to bargain.

---

6. Two of these 6 were excluded by the Board because one was a guard and one a clerical employee and, hence, ineligible to be included in the appropriate unit. Their exclusion on other grounds, again, does not detract from their probative value as evidence showing the activities of the supervisors.