NATIONAL LABOR RELATIONS BOARD
v. DADOURIAN EXPORT CORPORATION.
No. 24.

Circuit Court of Appeals, Second Circuit.

Nov. 3, 1943.

Roy Compton, of Chicago, Ill., and Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Howard Lichtenstein, Asst. Gen. Counsel, and David Findling, and Sanford H. Bolz, Attys., National Labor Relations Board, all of Washington, D. C., for petitioner.

Max J. Lovell, of New York City (Max Milstein, of New York City, on the brief), for respondent.

Before L. HAND, CHASE, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

This case comes before us upon a motion by the Board for an order "enforcing" its own "cease and desist" order, which directed the respondent to bargain collectively with a local of the Congress of Industrial Organizations, as the representative of all its "production workers engaged in processing, repairing, cleaning, shipping and packing." The respondent now admits that the Board selected an "appropriate unit" for bargaining, but argues that it should have included the employees of a wholly owned subsidiary, who did the same kind of work in the same plant; and, if that be not true, that four of the votes necessary to the majority on which the Board relied were procured by means which vitiated the consent of the employees who cast them. We need consider only the second of these objections.

The Board found that there were forty-six employees in the "appropriate unit," so that twenty-four were necessary to a majority. In fact twenty-seven signed, but of these the Board found that one had made "an effective revocation of a valid designation." Four of the remaining twenty-six appeared before the examiner as witnesses and testified that they were all unwilling to join the union, but that one, Capra, a fellow employee, who was organizing the plant for the C. I. O., told them to go to a room where there were a number of other employees, and that when they arrived he persuaded them to sign. They were all illiterate persons with only a most rudimentary acquaintance with English; and they described the means used to secure their signatures in the following terms. One, a woman, swore that Capra said to her: "You no sign, you no work, you no come to-morrow." Another, Solomon, swore that Capra said: "You are supposed to come in union; you cannot work in this place." A third, Slon, swore that he tried twice to escape from Capra, who twice "grabbed" his coat and "dragged him away"; and that when Slon said that he did not want to sign Capra had answered: "You can't work in here." The fourth, Blinder, swore that Capra had told him: "Everybody got to join the union; otherwise they would not be able to work here because" (of?) "the union." Capra was not called to deny this testimony; and, although

one, Urwand, who was also present when the employees signed, said that he personally did not tell them that they must join, he was not questioned about Capra's activities as organizer.

We need not say how we should have felt obliged to decide, had the Board declared that it did not believe these witnesses; arguendo, we shall assume that we should have accepted its finding, regardless of the fact that the testimony stood uncontradicted. But it did not discredit them, and we must take what they said as true, since the Board disposed of the case on the theory that it was irrelevant to the issue of the union's right to act as a bargaining representative. To support this position the Board invoked our decision in National Labor Relations Board v. Dahlstrom Metallic Door Co., 2 Cir., 112 F.2d 756, 758; in which we had before us an offer of testimony that the union "organizers had threatened that initiation fees would be raised after recognition had been achieved, and that when the objective of a closed shop was obtained, non-members would lose their jobs." Page 757, of 112 F.2d. We held that it was not improper for the union to put that pressure upon hesitant employees, because it did no more than "explain the legitimate consequences of joining or remaining aloof." In National Labor Relations Board v. Karp Metal Products Co., 2 Cir., 134 F.2d 954 (decided after the Board had decided the case at bar) the employees testified that the union organizer induced them to sign by saying that the union already had a majority, or that it would get a majority, and that once it got it, the employee would lose his job. We thought that. this was the equivalent of what the respondent had offered to prove in the Dahlstrom case: i.e. that if the union got control and secured a "closed shop," all who had not joined would be forced out. If the pressure put upon the four employees in the case at bar was no more than that; that is, if it was a truthful statement of what might follow if the employee refused to join the union, the Board was right.

It seems to us that Capra's statements went much further, and that the employees must have understood him to mean that a refusal to join the union would result in an immediate loss of their jobs. There can be no doubt that that was true in the case of the woman: she was told that she could not come back the next day. Solomon was not, it is true, quite so explicit; but he was told that he would not be allowed "to work in this place," if he did not sign. That was not made conditional upon anything which the union might succeed in accomplishing in the future, but was put as the immediate consequence of refusal. The same is true of Slon, with the added circumstance that he was actually assaulted and brought back to vote when he tried to escape from Capra. The deduction of these three votes leaves less than a majority, even though we count the vote of Blinder. The proof as to him may be thought not to go so far, though we cannot see any substantial difference between him and the others. We cannot agree that the statute, 29 U.S.C.A. § 151 et seq., sanctions the selection of a bargaining representative by such means. Fraud—which this was—will vitiate consent as well as violence, and the Board itself implies that a vote procured by violence should not be counted. It is quite true that only an employer can be guilty of "unfair labor practices," (§ 8), but § 7 confers the right on all employees freely to choose their bargaining representatives, and the invasion of that right is as much a wrong, when committed by a union organizer as by an employer. The fact that when it is not committed by an employer, the Board has no power to use its peculiar remedies to effectuate the policies of the act, must not blind us to the fact that those policies include employees' freedom from interference with their choice of representatives from any source whatever.

We do not forget the latitude which we must accord to all the Board's findings. In National Labor Relations Board v. Standard Oil Company, 138 F.2d 885, we have just decided that upon those issues as to which it must be assumed to have a competence, born of its specialized acquaintance with labor relations—such as the extent and persistence of an employer's influence upon a succeeding company union—it is for practical purposes supreme. If this is such an issue, it should be supreme here as well; but it seems to us that to say so would reduce the review which the statute indubitably gives to courts to shadow and simulacrum. It would be fantastic, we think, to say that only those versed in labor relations are competent to determine the meaning of such language as that we have quoted, because it was addressed to employees. As we have said, the Board might have refused to believe

the witnesses at all, but if it did not, the issue involves a construction of the law: i.e. the scope of the right to choose representatives. Nothing in the books suggests that in the end the courts have not that responsibility.

█ Nor can we see that the absence of any proof of Capra's authority to act for the union is material. Since the issue is of protecting the rights granted to all employees by the act, its policies are as much frustrated whether an authorized agent of the union is the actor or someone else; for the overriding consideration must always be the employees' untrammelled freedom of choice; upon that the whole framework rests. Moreover, even were we to disregard that dominant consideration, the right of a union to act as bargaining agent depends upon the votes of the employees, and, if it accepts and uses their votes, it necessarily ratifies the means by which they have been procured, even though it did not authorize them in the first instance. That follows from ordinary principles of agency. We hold that the four votes should not have been counted, and that the union was never chosen by a majority of the "unit" as its bargaining agent.

The motion to enforce is denied; and the order to "cease and desist" will be set aside in full.