**NATIONAL LABOR RELATIONS BOARD.**
v.
**JAMES THOMPSON & CO., Inc.**
**No. 10, Docket 22639.**

United States Court of Appeals
Second Circuit.
Argued Oct. 13, 1953.
Decided Dec. 2, 1953.

Owsley Vose, Atty., George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Mary E. Williamson, Atty., N. L. R. B., Washington, D. C. (Louis Libbin, Washington, D. C., of counsel), for petitioner.

Woodrow J. Sandler, Frank & Gonnet, New York City (Arthur Frank, New York City, of counsel), for respondent.

Before L. HAND, SWAN and AUGUSTUS N. HAND, Circuit Judges.

**L. HAND, Circuit Judge.**

This case comes before us upon a petition of the Labor Board for an enforcement of its order against the respondent, a corporation engaged in interstate commerce. The Board's decision found that the respondent had violated § 8(a) (1, 3, 5) of the Labor Management Act, 29 U.S.C.A. § 158(a) (1, 3, 5), and made the usual "cease and desist," collective bargaining and "reinstatement" order. It had filed a complaint, and appointed a trial examiner, who held hearings and filed an "intermediate report," recommending that the complaint should be dismissed in toto; but on appeal it reversed the examiner's findings and granted all the relief demanded. The facts were as follows. The respondent is a small corporation situated in Valley Falls, Rensselaer County, New York, and engaged in making twine and kindred fabrics. Its proper "bargaining unit" is made up of seventy-two employees, among whom one, Cohen, an organizer for the Textile Workers Union, began on October 3, 1950 to distribute "application cards." At least forty had signed cards before ten o'clock on the morning of the fourth, when Cohen, who had meanwhile gone to Albany, telephoned Flanagan, the respondent's superintendent at Valley Falls, that a majority of the employees had signed to join the union. Flanagan expressed doubts as to this, and Cohen suggested that the cards be checked by a disinterested person, or that an election be had by the New York State Mediation Board. Flanagan answered that he would "like to speak to my people," and that he would call a meeting of the employees. Cohen came back to the plant about noon and at once called a meeting of those who had signed for one o'clock—the same hour that Flanagan had himself set for a meeting of all the employees. During the lunch hour Cohen told the employees that Flanagan had refused to meet him, but suggested to a committee that had been formed that Flanagan might deal with them in his absence. Those who had joined the union refused to do this;

and "a substantial majority of the employees ended up at the union meeting, from which they did not thereafter return to work." A strike was begun by at least one o'clock. There is no definite finding as to what Flanagan said to those who attended his meeting, except that we may assume that he did say that "the conditions were such that the respondent could not afford to raise wages and that it could not operate the weave shop under a union." The examiner found that Flanagan had had bona fide doubt that the union had a majority, because it had not gone "far enough either in forcing its demand for recognition or in bringing its majority status to the attention of the proper officials." This finding the Board reversed, and found that Flanagan's refusal to deal with the union on the morning of the fourth was not in good faith. For this it relied largely upon his calling his own meeting at one o'clock, at which he "sought to dissuade them from resorting to union organization by, among other things, promising a general wage increase." Also because "such dealing with the employees in the face of a prior bargaining request by the union which claimed and enjoyed majority status, in itself constituted a refusal to bargain with the union, because it violated the essential principle of collective bargaining, and completely negated the respondent's asserted good faith in refusing to deal with the union. The respondent's lack of good faith * * * is further shown by its other conduct violative of section 8(a) (1) * * * as more fully set forth hereinafter."

■ This issue seems to us to be one on which the examiner's finding should have prevailed under the doctrine of Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. "Good faith" is one form of credibility; it means that the motive that actuated the conduct in question was in fact what the actor ascribes to it: *i. e.* that what he gives as his motive was in truth his motive. Applied to the case at bar, it means that, when

Flanagan said to Cohen, and repeated on the stand, that he did not know whether Cohen had secured a majority and that he wished to find out, he was telling the truth about what he believed. As was inevitable, the Supreme Court did not try to lay down in general terms how far the Board should accept the findings of its examiner. Plainly it did not mean them to have the finality of the findings of a master in chancery, or of a judge; but it necessarily left at large how much less reluctance the Board need feel in disregarding them than an appellate court must feel in doing the same to the findings of a district judge. The difficulty is inherent in any review of the findings of a judicial officer who chooses between discordant versions of witnesses whom he has seen, because the review does not bring up that part of the evidence that may have determined his choice. Over and over again we have refused to upset findings of an examiner that the Board has affirmed, not because we felt satisfied that we should have come out the same way, had we seen the witnesses; but because we felt bound to allow for the possible cogency of the evidence that words do not preserve. We do not see any rational escape from accepting a finding unless we can say that the corroboration of this lost evidence could not have been enough to satisfy any doubts raised by the words; and it must be owned that few findings will not survive such a test.

So tested, it seems to us that the examiner's finding should stand that Flanagan's refusal to deal with the union was based upon an honest doubt whether Cohen had obtained the "cards" of a majority of the employees. As has appeared, the Board bases its refusal to accept this finding upon what it regards as Flanagan's hostility to the formation of any union, as he expressed it before and after their talk on the telephone. For example, it says: "direct dealings with the employees in the face of a prior bargaining request by the Union which claimed and enjoyed majority status, in itself constituted a refusal to bargain with the Union." With deference we cannot feel the force of this reasoning. It seems to us most natural for Flanagan to have doubted whether Cohen could have secured a majority during one day; and any hostility that Flanagan may have felt towards a union was more likely to raise doubt in his mind about Cohen's claim than to satisfy him of its truth. Finally, to deal directly with employees, however unlawful in itself it may have been, throws substantially no light on how far he thought the effort had succeeded to form a union. As a penalty it might be proper, but as a link in reasoning it seems to us immaterial. At least it was quite insufficient to overturn those indications of good faith that the examiner may have found in Flanagan's behavior on the stand. We reinstate the reversed finding.

■ Moreover, even if we are wrong about that, the case should not have been disposed on the assumption that an uncoerced majority of the employees had signed cards before the strike on October fourth. The Board found that seven of those who had signed testified "that they were told by union solicitors that they would lose their jobs unless they signed union cards." Three of these said that Cohen had told them this; three more, that another solicitor, Kelley, had done so; and one, that Stedman, who had no apparent connection with the organizers, had done so. Cohen and Kelley each denied these statements and Stedman was not called. The examiner made no finding as to this conflict; nor did the Board; it might therefore be necessary to send the case back, had the Board not assumed "without deciding, that these statements were made"; which we accept as the equivalent of a finding. Although we held during the Wagner Act that it was not necessarily unfair for a union solicitor to tell an employee that he would lose his job if he did not join,[1] we distinguished between

1. National Labor Relations Board v. Dahlstrom, etc., Co., 2 Cir., 112 F.2d 756; National Labor Relations Board v. Karp, etc., Co., 2 Cir., 134 F.2d 954.

a case where the statement was no more than a declaration of what would happen if the union won and secured a closed shop, and a statement that implied an immediate exclusion, if the majority decided for a union.[2] Now that a closed shop is unlawful, we do not see how it can be other than unlawful to secure votes by saying that, if the union wins, the employee will lose his job, for he can always keep it by later joining the union. Indeed, we do not understand that the Board differs as to this.

 In National Labor Relations Board v. John Engelhorn & Sons, 134 F.2d 553, 556, the Third Circuit ordered an employer to deal with a union that the Board had certified, although it did not have a majority vote, because a rival union, which did have a majority, was shown to have used improper persuasion to get the votes of "six or seven" out of eighty employees in the plant. The vote had been in the proportion of sixteen to fourteen, and even after deduction of the seven the disestablished union had a clear majority. In avowed consonance with the doctrine laid down in National Labor Relations Board v. Link-Belt Co., 311 U. S. 584, 61 S.Ct. 358, 85 L.Ed. 368, the Court of Appeals said that it was true that "the employer's unfair labor practices may not have affected all or even a majority of the employees so as to be a direct cause of their affiliating with Local 174"—the successful union—but nevertheless that this was "of no consequence. All that need be established to show a violation of § 8 is conduct of an employer which is defined therein as an unfair labor practice. That section does not require proof that the proscribed conduct had its desired effect." It will therefore be observed that this was more than a holding that it is not necessary to prove that the unfair labor practice has changed the votes of the individuals addressed; and it is in addition a holding that it is not necessary to prove that the

practice reached enough employees to change the majority into a minority. The Board itself in several cases has held in "representation elections" that, in order to throw out the result of an election, it is not necessary to show that the unfair practice reached enough employees to destroy the majority. Once it is shown that the union or employer used such practices at all, all votes for it or him are to be disregarded.[3] The Board answers that all these decisions concerned "representation elections" in which the balloting was secret; that to inquire as to the extent of the unfair practice would violate that secrecy; and that in the case at bar the signing of the "cards" was not secret, so that it was proper to learn to how many the statements had been made. We can see no basis for this distinction. It is quite true that in the case of a "representation election" it would violate the secrecy of the ballot to ask the voters whether the unfair practice had had any influence on their votes, and that would have been irrelevant anyway because under National Labor Relations Board v. Link-Belt, supra, 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368, such an inquiry is not permissible. But we see nothing that can possibly be thought to invade the secrecy of the ballot in finding out whom the unfair practice has reached, at least when it is a statement like that at bar. That calls for no disclosure of how the employee has voted. The Board apparently has not itself been averse to applying the doctrine to an election by "cards," for in National Labor Relations Board v. Wells, Inc., 68 N.L.R.B. 545, it refused to let such an election stand, although it did not appear that the unfair practice had spread to enough employees to impair the majority.

 Such a result might perhaps be justified on the theory that, having proved the wrong, the wrongdoer must clear up any doubts about how far it has

---

2. National Labor Relations Board v. Dadourian, etc., Corp., 2 Cir., 138 F.2d 891.

3. National Labor Relations Board v. G. H. Hess, 82 N.L.R.B. 463; National Labor Relations Board v. U. S. Rubber Company, 86 N.L.R.B. 3, 5; National Labor Relations Board v. General Shoe Corp., 97 N.L.R.B. 499.

gone; and that, just as the Board need not decide how far the unfair practice determines the vote of any given employee, so it need not decide how many employees have learned of it. This appears to us a harsh doctrine, whether applied to a union or an employer, and we might hesitate to adopt it; but we do not think it necessary to do so in the case at bar, because it was proved that the unlawful statement had been so widely spread among the employees that it is fair to require anyone who wished to sustain the vote to prove that there was a majority whom it had not reached. The situation was as follows. Eleven employees in all were told or overheard the statement. Forty votes were cast before the demand for union recognition was made, at ten A.M. on the fourth; and of these thirty-seven were necessary to a majority. The statement was heard by at least three of those who voted before the demand for recognition was made; and it is certainly likely that, since at least eleven employees heard it at some time on the third or fourth, one more voter also heard it than the three who are proved to have done so. And therefore, although we hold that the examiner's finding should have stood on the issue of "good faith," we also disagree with the Board's finding that the union was proved to have had in fact a lawful majority on October fourth. This disposes of the case under § 8(a) (5).

■ The Board also found that the respondent had been guilty of thirteen unfair practices under § 8(a) (1) beginning with two before the strike began on the morning of the fourth and ending in November. The examiner had found for the respondent as to all of these, and as to a number we agree: especially as to the first two, which depended either upon the credibility of the witnesses or concerned statements of Flanagan that were privileged under § 8(c). On the other hand, at least two of the Board's reversals of the examiner's findings were within its competence, although we are not sure that we should ourselves have done likewise, had we been

in its place. These are those it marks "h" and "m" in its "decision." The first of these was what Judell, one of the two "owners" of the respondent, said to McCardle, one of the union's "plant committee," "sometime in October" after the fifth. As conceded by Judell these were his words: "John, I didn't think you would be mixed up like this. We can't afford to run the mill with the union with our machinery. John, bring them all back and in a week they will all be satisfied." The only part of this that § 8(c) did not protect was the last clause: "in a week they will be satisfied," and that was so equivocal a statement that we should ourselves have given it the benefit of the doubt. However, when addressed to a leader of the strikers, it is susceptible of the interpretation that, if he would bring them back, the employer would give them some vague, ill-defined benefit. At any rate, we are not prepared to say that this was so unreasonable a construction that we are free to substitute our own interpretation. The second instance was a wage advance about October 15th of five dollars a week to all those who had remained at work. The respondent explains this by saying that there was more work to do at the plant because of the strike, and that it was a disagreeable thing to pass the picket lines, which we can well believe. On the other hand, the rise was made general on January first, and continued after the strike was over. It is quite true that the examiner's finding on this question concerned the respondent's motive, and it may be argued that, as in the case of Flanagan's doubt about the majority, the finding is really one of credibility. But that is not quite the whole story, for the respondent gave no such explanation of the rise to the employees; on the contrary, without comment it slipped a five dollar bill into the pay envelope of each. Regardless of the respondent's motive that was conduct that the recipients of the advance would naturally, if indeed not inevitably, think was made to encourage them for not joining the union. These two instances are ample to support the Board's order under

§ 8(a) (1), and we do not think it necessary to pass on the nine that we have not mentioned.

█ There remain two other questions: the "reinstatement order" of those who went on strike, and the refusal to reinstate Lozo. We do not find it necessary to discuss Lozo's case in detail; here again it is a question of Flanagan's motive; and we can find in the record no such reason for disbelieving him as would necessarily outweigh the warrant of his credibility that his carriage, deportment and address upon the stand may have reasonably assured. As to whether the thirteen "unfair labor practices," that the Board found, "prolonged" the strike and therefore made proper an order of "reinstatement" of the strikers in compliance with the union's letters in January and February, 1951, we start with the examiner's finding that in its origin the strike was not the consequence of a refusal to bargain with a union, known by the respondent to be entitled to represent the employees. It is indeed thoretically possible that the subsequent practices might have prolonged the strike although the respondent was not guilty for refusing recognition of the union; but there is not a syllable in the record that any one of the eleven supposed unfair practices (thirteen less two) kept it going a day longer than the refusal to deal with the union did. That was the grievance on which the employees went out, and there is not the least likelihood that, as soon as the respondent should have changed its position on that, the strikers would not have returned at once, regardless of anything else that had happened after October fourth. Indeed, the only testimony on the subject is that the other complaints did not prolong the strike. It has been uniformly ruled and is now well settled that to entitle employees to reinstatement because of unfair practice of the employer, after a strike has been declared, it must appear that the practice prolonged the strike; and this necessarily follows from the fact that only then can it be that any part of the unemployment for which reinstatement is the remedy has resulted from a violation of the Act.[4] In the case at bar the examiner had no reason to pass on the question, because he had held that there had been no such practices; yet he found without stating his reasons, that the incidents had not prolonged the strike. The Board found the opposite, also without any reasons. However, none were necessary in its case; for, having found that the origin of the strike was the respondent's refusal to deal with a known majority, it followed that this unlawful act caused all the ensuing unemployment. We have no reason to suppose that had the Board believed, as we now hold, that the refusal was not an unlawful practice, it would have held that the later practices prolonged the strike; and, if it had done so, we should not have agreed.

Paragraphs 1(b), 1(c), 2(a), 2(b), 2(c) and 2(d) of the order will be reversed and the complaint dismissed as to them.

Paragraphs 1(a) and 1(d) will be enforced, as will 2(e) and 2(f), when modified to accord with paragraph 1(a).

4. National Labor Relations Board v. Jackson Press, 7 Cir., 201 F.2d 541, 546; National Labor Relations Board v. Worsted Mills, 43 N.L.R.B. 445, 468; National Labor Relations Board v. St. Mary's Sewer Pipe Co., 54 N.L.R.B. 12, 26; National Labor Relations Board v. Myers Products, 84 N.L.R.B. 32, 51; National Labor Relations Board v. Anchor Rome Mills, 86 N.L.R.B. 1120, 1122, 1153.