**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**NISKAYUNA CONSUMERS COOPERA- TIVE, Inc., Respondent.**

No. 234, Docket 30602.

United States Court of Appeals
Second Circuit.

Argued Dec. 6, 1966.

Decided Dec. 29, 1966.

Marcus W. Sisk, Atty. N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, H. M. Levy, Atty., Washington, D.C., on the brief), for petitioner.

Sanford Rosenblum, Albany, N. Y., for respondent.

Before LUMBARD, Chief Judge, and HAYS and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

The National Labor Relations Board petitions to enforce its order requiring respondent Niskayuna Consumers Cooperative, Inc. ("Niskayuna") to cease and desist, inter alia, from interfering with employees in the exercise of the right to self-organization and refusing to recognize and bargain collectively with Amalgamated Meat Cutters, Butcher Workmen and Affiliated Crafts of North America, District Union Local No. 1, AFL-CIO ("the Union"). 155 N.L.R.B. No. 23 (1965). The Board found that Niskayuna had violated sections 8(a) (1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a) (1), (5). Niskayuna does not single out particular Board findings as unsupported by substantial evidence. Instead it broadly attacks the use by the Board of union authorization cards and argues that the Board's order that Niskayuna bargain with the Union does not effectuate the policies of the Act.

A brief survey of the facts is necessary to understand Niskayuna's argument. The findings of the Trial Examiner, which were adopted by the Board, were as follows: Niskayuna maintains a store in Schenectady, New York, which sells foodstuff and other products. In July 1964, its employees began to engage in self-organization activities and contacted Marvin Pizzo, business representative of the Union. Pizzo gave one of the employees some union authorization cards, explaining that if a majority of the employees signed the cards, he would present them to Niskayuna and ask for recognition of the Union. By mid-August, 16 signed cards had been re-

turned to Pizzo, enough to lead him to believe that it was time to seek recognition. Two days later, he showed the cards to Niskayuna's store manager, who counted them, remarking at intervals "they stabbed me in the back." The manager conceded that a majority had, indeed, signed the cards, but stated "we don't want a union here." The next few weeks witnessed several instances of interference, coercion, and restraint, as those terms are used in the Act, of employees by Niskayuna, notably a threat by Niskayuna to Pizzo that Pizzo's associate would be prosecuted for buying an alcoholic beverage for a minor if Pizzo did not withdraw the charges that are the basis of the instant case. Moreover, Niskayuna did not recognize and bargain with the Union on request, even though the store manager had accepted the authorization cards as proof of the Union's majority status; the insistence on a Board election before recognition was not in good faith.

In determining whether the Union had achieved the status of exclusive bargaining representative when the cards were presented to the manager, the Board reasoned as follows: There were 27 employees in the appropriate unit; 16 authorization cards were introduced into evidence at the hearing. Niskayuna attacked the validity of only five; as to four of these, the Examiner held the designation of the Union as bargaining representative to be proper. These four cards, when added to the eleven unchallenged cards, gave the Union a majority, or 15 out of 27 employees. The Examiner, and by adoption of his findings the Board, therefore found it "unnecessary" to determine the validity of the fifth card.

Niskayuna attributes a devious motive to the Board's failure to rule on the fifth card. Respondent does not, of course, claim that if its attack on the fifth card is upheld here, reversal must follow as a matter of arithmetic; this court can judicially notice that 15 is more than 12. Niskayuna does argue, however, that the Board's refusal to pass on the fifth card showed its concern that a conclusion that

the fifth card had been produced by misrepresentation or coercion by the Union would invalidate *other* cards. Niskayuna says that a representation election will be set aside by the Board much more readily than union designation cards even though the latter are inherently unreliable, that this is inconsistent and unfair, and that the Board should have itself inquired more diligently into the entire atmosphere surrounding the obtaining of the cards.

██ We need not say much as to Niskayuna's frontal attack on union authorization cards; we have approved the Board's use of them in principle, NLRB v. Divigard Baking Co., 367 F.2d 389 (2d Cir. 1966) (per curiam); NLRB v. Gotham Shoe Mfg. Co., 359 F.2d 684 (2d Cir. 1966), although we reserve the right to question their application in a particular case. See NLRB v. Flomatic Corp., 347 F.2d 74 (2d Cir. 1965); cf. Note, Union Authorization Cards, 75 Yale L.J. 805 (1966). We find no error in the Board's evaluation of the cards in the present case. Despite the broad statements respondent cites as to how the Board supervises an election, e. g., Carl T. Mason Co., 142 N.L.R.B. 480, 484–85 (1963) (concurring opinion), the Board does not set aside elections for isolated incidents, which tend to affect only a very small percentage of the employees. See, e. g., Lloyd A. Fry Roofing Co., 123 N.L.R.B. 86, 88 (1959); Aeronca Mfg. Corp., 121 N.L.R.B. 777, 779 (1958); Independent Nail & Packing Co., 120 N.L.R.B. 677, 680 (1958); Western Table Co., 110 N.L.R.B. 17, 18 (1954). In this case, there was evidence of a threat to only two card-signers. As to one (employee Dutcher), the Examiner credited other testimony and did not believe that the threat had been made; the other (employee Lowrey) signed the fifth card not ruled on by the Examiner. The Board could properly disregard a threat to one out of 27 employees when 15 cards were found to be untainted. Similarly, the employer's claim of Union misrepresentation to achieve card signing (which the Examiner rejected) only went to

three cards. The case is thus different from two decisions of this court relied upon by respondent: NLRB v. Dadourian Export Corp., 138 F.2d 891 (2d Cir. 1943), in which the Board improperly held that the threats were irrelevant even though invalidating the cards of the threatened employees would have destroyed the union's majority, and NLRB v. James Thompson & Co., 208 F.2d 743, 747–48 (2d Cir. 1953), in which the unlawful statement was widely spread among the employees. As to the duty of the Board or the General Counsel to take the laboring oar from respondent, we need only point out that the General Counsel called 17 of Niskayuna's employees as witnesses. Although they were thus available for cross-examination, Niskayuna attacked the validity of only five cards. Given the skimpy evidence of coercion or misrepresentation by the Union, we accept the inaction of Niskayuna's attorney below as a judgment that it would have been futile to try to prove that the other employees knew of the alleged threat to Mrs. Lowrey and were intimidated by it or had been duped into signing cards. Under all the circumstances, the Board's order was proper and did effectuate the policies of the Act. NLRB v. Gotham Shoe Mfg. Co., supra.

Enforcement granted.