NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

UNITED MINERAL & CHEMICAL CORPORATION, Respondent.

Nos. 99–102, Dockets 31090/93.

United States Court of Appeals Second Circuit.

Argued Dec. 5, 1967.

Decided Jan. 16, 1968.

Morton Namrow, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, William Wachter, Washington, D. C., attorney of counsel), for petitioner.

Benjamin Mandelker, New York City, for respondent.

Before WATERMAN, MOORE and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

The NLRB asks us to enforce an order, 155 N.L.R.B. 1390, finding that an employer had violated §§ 8(a) (1), (3) and (5) of the National Labor Relations Act during a union organizing campaign in the spring of 1964. In addition to usual cease and desist and notice provisions, the order directed reinstatement and back-pay for two workers, a small amount of back-pay for a third, and bargaining. The petition, stoutly resisted

in an able brief and argument for the employer, raises a number of close issues. We agree with the Board on some and with the employer on others.

One of the few points of concord is that the Board was warranted in considering together the employees of United Mineral & Chemical Corporation, which is engaged in converting and selling mica, abrasives, packaging material and related products, at 16 Hudson St., New York City; Consolidated Distributors, Inc., which is engaged in importing capacitors and related products, also at 16 Hudson St.; and Titan Plastics Corporation, which is engaged in the manufacture and sale of plastics, plastic laminations and related products, at 46 Beach St., some five blocks away. There is also a warehouse, at 173 Duane St., about one block from 16 Hudson St. and six from 46 Beach St. Three brothers, Alexander, Samuel and Emanuel Lipetz, are the stockholders of United; Alexander is the sole stockholder of Consolidated and Titan. Alexander is the president and chief executive officer of all three corporations; Emanuel and Jack Gelblum are officers and directors of all three; Samuel and Herbert M. Rosenthal are officers and directors of United only. The unit consisted of the production and maintenance employees of the three corporations, hereafter collectively referred to as United, the company or the employer.

It will be useful to begin with a summary statement of the major incidents in the controversy, postponing more detailed consideration of them and statement of others of less importance. The union activity began on April 13, 1964, when an employee, Marvin Wiprovnick, later assisted by Aurora Rojas, who spoke Spanish, and Adolph Thomas, a supervisor, started to solicit authorization cards on behalf of United Mechanics' Union Local 150 F, Amalgamated Meat Cutters & Butcher Workmen of North America, AFL-CIO (the Union).[1] On

---

1. The cards read:
"I hereby apply for membership in Local FLM Joint Board (A. M. C. &

B. W. of N. A., AFL-CIO) and authorize and empower its authorized representatives to represent me and negotiate

Monday evening, April 20, some 12 employees, including Wiprovnick and Thomas, attended a meeting at Union headquarters. At 8:10 A.M. on April 21, Wiprovnick was discharged by his supervisor, Boris Kushner, who said, "Mr. Lipetz, the night before, told me to fire you and you know the reason why very well." Twenty minutes later Kushner called another employee, Giraud, into the hallway and, according to the latter's reasonably credited testimony, said "Juan I know where you was last night. I want to know why you went there, you went to the meeting with the union * * *. So I [Giraud] told Boris. If you want to find out, find somebody else * * *. He told me why Marvin Wiprovnick was fired, because of his attitude * * *. [H]e told me as soon as Marvin started in the company, I change."

Wiprovnick promptly reported his discharge to the Union. Two representatives went to the company to demand his reinstatement and also recognition, although, as the General Counsel concedes, the Union did not have a majority at that time. They were told that Alexander Lipetz was unavailable and, when they insisted on waiting for him in his office, that if necessary the police would be called to throw them out. In the morning of April 22 the Union distributed a handbill inviting employees to a meeting that evening and saying, incorrectly, that "most of the workers in your shop have already joined our Union." After the meeting more authorization cards were signed; over the next few days a card majority was gained. On April 22 the Union filed a representation petition and an unfair labor practice charge based on Wiprovnick's discharge.

In the course of a visit to the Duane St. warehouse on April 23, Alexander Lipetz found that Thomas and two employees, Werbitzkij and Hernandez, were punching each other's time cards in violation of posted company rules. By this time Lipetz had become aware of his need for

legal advice, and consulted Benjamin Mandelker, Esq., an attorney experienced in labor matters. When he told Mandelker what he had discovered but that he preferred to fire Thomas only, Mandelker advised that such action would inevitably lead to a claim that Thomas was being discharged for union activity and that a discharge for cause should therefore include all the wrongdoers; this was done the following afternoon. Also on April 23, after a union representative had forced his way into Lipetz' private office, Mandelker met with the Union to discuss Wiprovnick's discharge and the Union's claim to majority status. After conferring with his client, he informed the Union that Wiprovnick would not be reinstated and that the company believed the employees should be divided into five units. The Union agreed to this and was informed that a card check by a government agency would be required.

On Friday, April 24, the Union's attorney, Harold Cammer, Esq., informed Mandelker that the New York City labor department had agreed to conduct the card check and that if the parties signed an agreement immediately the NLRB would hold an election the following Thursday. Mandelker said he would be unable to go to the Board's office that day and would have to consult with his client as to the appropriate course. On Monday, April 27, Mandelker informed Cammer that United had advised him that some of the employees had been coerced into signing and that a card check was therefore unacceptable. He also announced United's intention to file unfair labor practice charges against the Union because of coercion; these were filed that day. The Union countered with a strike characterized by a number of incidents of violence, which lasted from April 28 to July 3, when the Board issued its complaint.

### Illegal Discharges

*Wiprovnick.* Whether Wiprovnick was discharged in violation of § 8(a) (3) is

---

in my behalf as my agent for collective bargaining and the settlement and ad-

justment of grievances involving my conditions of employment."

important not only in and of itself but because the affirmative finding on this score constituted a principal basis for the Board's rejection of the defense of good faith doubt with respect to the Union's majority. United mounted the two-fold defense of good cause for discharge and lack of knowledge of Wiprovnick's union activity. Kushner testified that as he and another employee, Elfreida Mehlberg, were leaving the plant late in the afternoon of April 20, he complained that Wiprovnick and Giraud "were very lax in their work"; that this led Mehlberg to volunteer that Wiprovnick, who had had some responsibility for sending Christmas gifts to customers, "was stealing liquor during Christmas time," and that when Kushner inquired why he hadn't been informed earlier, Mehlberg responded that she had received the information from another employee, Olga Galay, who had seen Wiprovnick "putting liquor in the garbage can" but had pledged her to secrecy. Kushner said he had reported this early next morning to Alexander Lipetz who, on being satisfied that Kushner believed Wiprovnick "might have" stolen liquor, instructed Kushner to fire him but to make no explanation since that might interfere with efforts to detect others who were implicated. Kushner and Lipetz denied knowing of Wiprovnick's union activity prior to the discharge.

■ The Board was justified in refusing to credit this. The circumstances —abrupt discharge of the spearhead of the organizing drive early in the morning after the first union meeting—were as suspicious as could be imagined, cf. NLRB v. L. E. Farrell Co., 360 F.2d 205, 208 (2 Cir. 1966). While this alone might not suffice, the company's evidence was of the very sort warranting a trier of the facts in believing the truth to be the opposite of what was asserted.

It would indeed be an amazing coincidence that Mehlberg should have revealed the Christmas theft late on the April afternoon preceding the Union meeting.[2] Moreover the Examiner was warranted in crediting Galay when she denied knowing anything of the theft or telling Mehlberg about it, in believing Giraud's testimony which indicated that the company had substantial knowledge of the union's activity only twenty minutes after the discharge, and in inferring that what it knew then, it knew shortly before. Regardless of the accuracy of the Examiner's "reconstruction" of the events, wherein the true revelation by Mehlberg to Kushner concerned Wiprovnick's union activity, there was ample evidence that in some way the employer had learned of this and that Wiprovnick was discharged on that account, with the supposed theft of the bottle of liquor at best an excuse. Because of Wiprovnick's conduct during the strike the Board refused to order his reinstatement and limited back-pay to May 4, the first of several assaults he committed on employees who had not joined. We grant enforcement of this portion of its order.

■ *Werbitzkij.* It is common ground that the company had good cause to discharge Werbitzkij[3] and had no knowledge of any union activity on his part. Indeed, the Board does not assert that his discharge violated § 8(a) (3). The finding of the Trial Examiner, sustained by the Board, is rather that the discharge nevertheless "interfere[d] with, restrain[ed], or coerce[d] employees in the exercise of the rights guaranteed in section 7" in violation of § 8(a) (1). This rests on the basis that Lipetz would have discharged only Thomas save for the advice of his attorney that such a course would very likely subject United to a colorable claim of violation of § 8(a) (3), and "thus, it was only because of

---

2. She was unable to account for the delay and failed to corroborate Kushner's testimony about Galay's having requested secrecy.

3. General Counsel sought no relief with respect to Hernandez who was discharged under the same circumstances as Werbitzkij "because Hernandez refused to cooperate with General Counsel in the preparation of his case."

the existence of the organizational campaign at Respondent's plants that Werbitzkij was discharged."

We know of no principle and have been cited no authority that such "but-for" causation suffices to support a violation of § 8(a) (1).[4] This is not like a case where an employer who had previously been lax in enforcing rules suddenly became severe when a union appeared so that employees might conclude that unionization would cause the employer to get tough,[5] or replaced all of a class of personnel with management representatives when a majority of the class had voted for a union, as in Allis-Chalmers Mfg. Co. v. NLRB, 162 F.2d 435 (7 Cir. 1947). Neither is it like a case where an employee not known to have engaged in union activity was discharged simply to give "cover" to an *illegal* discharge of one who was, as in Wonder State Mfg. Co. v. NLRB, 331 F.2d 737 (6 Cir. 1964) and NLRB v. Superflex Drugs, Inc., 341 F.2d 747 (6 Cir. 1965), on which the Board mistakenly relied. Here it is undisputed that the discharges were not for engaging in any protected activity but for a serious breach of company rules going to the core of the employment relation, and that there would have been no violation of the Act if Lipetz had fired all three men on the spot. We fail to see how § 7 rights were violated because Lipetz thought it wise to consult an attorney and follow the latter's reasonable advice that under the circumstances he could not prudently display the quality of mercy he would otherwise have extended to Werbitzkij and Hernandez.[6] We decline to enforce this portion of the order.

*Minski.* The third allegedly illegal discharge was of Ingrid Minski. She had been laid off from the mica department on April 17, three days before the first union meeting; General Counsel conceded this was for legitimate economic reasons and not for known union activity. The Trial Examiner credited the testimony of Alexander Lipetz, in charge of the mica department, and of Herbert Rosenthal, his assistant, that the layoff was permanent, although the simultaneous layoff of another employee, Grace Hall, was temporary. Their testimony was impressively confirmed by the reports filed by Gelblum on behalf of the company on April 20 [with respect to Minski] and April 22 [with respect to Hall] with the New York State Department of Labor. When Minski ascertained from the Unemployment Insurance Office at the end of May that her layoff was permanent, rather than temporary as she claimed the bookkeeper, Ann Schiano, had told her, she telephoned Samuel Lipetz to inquire why. He said he would ask his brother or Rosenthal who, he recounted, had complained about her work; he also asked if she had signed a union card and, on finding that she had, told her that nobody who had signed one would be taken back.

Crediting Minski's version of her telephone conversation with Samuel Lipetz, which took place after the Union's savage physical attack on his brother, see note 16 infra, the Trial Examiner nevertheless found the General Counsel had not met his burden of showing a change in status from temporary to permanent layoff. The Board held otherwise, stating that "on the entire record herein, we infer

4. In fn. 7 to its opinion the Board explicitly disclaimed the Trial Examiner's reliance on NLRB v. Burnup & Sims, Inc., 379 U.S. 21, 85 S.Ct. 171, 13 L.Ed.2d 1 (1964). We agree. While the Court there found that the discharges violated § 8(a) (1) despite the employer's good faith, this was on the ground that firing innocent employees engaged in protected activity had such an impact on § 7 rights as to outweigh the interest the employer believed he had in their discharge. The Court recognized that where, as here,

employee misconduct was "wholly disassociated from §. 7 activities quite different considerations might apply." Id. at 24, 85 S.Ct. at 173.

5. The Trial Examiner found that General Counsel failed to establish a previous history of leniency to employees who had punched the time cards of others.

6. We have been pointed to no evidence that other employees knew that Werbitzkij and Hernandez would not have been discharged except for the lawyer's advice.

that Minski's lay-off on April 17 was temporary." Since all the evidence was to the contrary [7] save for Minski's testimony as to what Schiano had said to her and Hall, the Board relied on the absence of testimony that anyone had told her the layoff was permanent and the company's failure to call Schiano and Hall to testify what she had been told. This is insufficient, particularly in view of the weight required to be given the Trial Examiner's credibility findings. Universal Camera Corp. v. NLRB, 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456 (1951); NLRB v. Majestic Weaving Co., Inc., 355 F.2d 854, 859 (2 Cir. 1966). The company was justified in thinking the General Counsel had not gone far enough toward meeting his burden to require it to rebut Minski's testimony as to what Schiano had said,[8] see 2 Wigmore, Evidence § 290(5) (1940 ed.); furthermore General Counsel's admission that he had unsuccessfully sought a witness to corroborate Minski, which is also in the record, largely negates the inference the Board drew in his favor. Since the finding of the temporary character of Minski's layoff is not supported by substantial evidence on the record considered as a whole, we decline to enforce the portion of the order requiring reinstatement and back-pay.

*Interrogation, Creating an Impression of Surveillance, and Requesting Employees to Engage in Surveillance*

■ We have already mentioned the first instance in which the Board found a violation of § 8(a) (1) by creating an impression of surveillance—Kushner's talk with Giraud on April 21 immediately after Wiprovnick's discharge. The finding was so clearly justified that discussion would be supererogatory.

Peter Jarkoff testified to being called into Samuel Lipetz' office [9] where the latter taxed him with having signed a union card. On Jarkoff's asking the source of the information, Samuel said that Rosenthal had told him and that he had seen Jarkoff's name "in the list." The Trial Examiner credited Rosenthal's testimony that he had not told Samuel that Jarkoff had signed a card and that he knew of no list of the employees who had; Samuel was not called. The Examiner was justified in concluding that even though Samuel had no basis for his remarks, they created an impression of surveillance in violation of § 8(a) (1). The Board correctly sustained the General Counsel's contention that the episode also constituted unlawful interrogation forbidden by that section. Samuel Lipetz' conversation with Jarkoff violated the standards enunciated by this court in Bourne v. NLRB, 332 F.2d 47 (2 Cir. 1964)—there was a "history of employer hostility and discrimination," the information sought was specific not general, Samuel was high in the corporate hierarchy, and the employee was "called from work to the boss's office."

■ The final incident under this rubric concerns a request found by the Examiner to have been made on April 23 by Emanuel Lipetz that employee Laurence Sciutto, in Lipetz' words, should "keep his eyes open. If he sees something, some kind of union activity, he should report it to me." Arguing against the conclusion that this was an

7. There was the additional fact that no replacement for her had ever been hired. The availability of a similar but less skilled job throughout the relevant period, on which the Board relies, has no tendency to disprove that Minski's layoff was intended to be permanent; its relevancy would go rather to a claim, for which admittedly no basis here exists, that she was discharged for union activity.

8. It is not claimed that Schiano, a bookkeeper, had any authority to determine the character of Minski's layoff; a statement by her to Minski that the layoff was temporary thus would not be direct proof of the fact but merely some evidence, contrary to everything else in the record, that this was what the management had told her.

9. He gave the date as April 21 but the Trial Examiner found it to be between April 23 and 27.

instruction to engage in surveillance in violation of § 8(a) (1), the company contends that Emanuel was simply acting under counsel's correct advice that United had the right to prevent union interference with work during company time. NLRB v. R. C. Mahan Co., 269 F.2d 44, 47 (6 Cir. 1959); NLRB v. Threads, Inc., 308 F.2d 1, 10 (4 Cir. 1962). If Emanuel wished to live within counsel's advice, he should have made his meaning clearer than he did. His own testimony bears a construction that his request to Sciutto included, perhaps unwittingly, union activity "during the lunch time" in which union solicitation is privileged. Republic Aviation Corp. v. NLRB, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945).

### Bargaining

The company opposes enforcement of the bargaining order on three independent grounds—(A) lack of a union majority,[10] (B) good faith doubt, and (C) inappropriateness of the remedy in view of the Union's conduct during the strike.

(A). *Majority status.* On April 27, the critical date for determining whether the Union had a majority, there were 54 employees in the unit and 40 signed cards after eliminating Minski and Werbitzkij. The Board threw out five cards solicited by supervisor Thomas, see NLRB v. Hamilton Plastic Molding Co., 312 F.2d 723 (6 Cir. 1963), leaving 35. It also eliminated the cards of three employees, Pinto, Toro and Fosley, because they were told by the Union both that everyone else had signed and that they would be fired if they didn't. Another card, Navarrete's, was not counted because the signer did not intend to mail it. This leaves 31.

Julie Lugo was falsely told by the Union that she was the last one to sign but was not threatened that discharge would ensue if she refused. She also testified, however, that she wanted the Union to represent her in negotiations and the Examiner consequently counted the card on the basis that Lugo did not rely on the misrepresentation. We cannot fault this ruling; NLRB v. H. Rohtstein & Co., 266 F.2d 407 (1 Cir. 1959), which the employer cites to show the invalidity of Lugo's card, is distinguishable since the employee there made it quite clear that he was relying on his belief that all the others had signed.

The Examiner did not count Perry's card because his testimony as to when he delivered it was contradictory and his card did not have an NLRB stamp dated April 27 as all the others did. The Board counted the card because Perry had said at all times that he *signed* the card before April 27. It contends that signing is enough and cites Retail Clerks Int'l Ass'n, AFL–CIO v. NLRB, 125 U.S. App.D.C. 63, 366 F.2d 642, 648 (1966), to support this, but that case held only that signing is enough when there is no employer demand for a card check—and here there had been although the employer later refused to go through with it. We find it unnecessary to resolve the issue since even if the Board was wrong, there would be 30 cards as against the requirement of 28. Since the employer's challenges to other individual cards are without merit, it thus can succeed as to lack of a majority only if the principle of NLRB v. James Thompson & Co., 208 F.2d 743 (2 Cir. 1953), is applicable.

In *Thompson* eleven employees had heard organizers threaten that they would be fired if they didn't sign cards and the union gained recognition. Three signers were proved to have been among the eleven and we held their cards invalid. Although this left the union with a majority of one, this court, in an opinion by Judge Learned Hand, refused to require bargaining "because it was proved that the unlawful statement had been so widespread among the employees

---

10. The company has not contended that, as held by the Fourth Circuit subsequent to the argument, NLRB v. S. S. Logan Packing Co., 386 F.2d 562 (1967), an employer is not required under any circumstances to recognize a union on the basis of a card majority. As to this we adhere to what was said in NLRB v. S. E. Nichols Co., 380 F.2d 438, 441 n. 1 (2 Cir. 1967).

that it is fair to require anyone who wished to sustain the vote to prove that there was a majority whom it had not reached." 208 F.2d at 748. Fully accepting that principle, we think this case differs in that the General Counsel did call all but two of the card signers, and even if we rule out their cards, that still leaves a bare majority.[11]

■ (B). *Good faith doubt*. In many decisions the Board and the courts have held that an employer may not be found to have violated § 8(a) (5) for refusing to bargain with a union asserting a card majority if (1) he doubted the validity of the claim, (2) he had reasonable ground for such doubt, and (3) the doubt bore adequate causal relation to the refusal. As to all three elements of the defense, General Counsel bears the usual burden of persuasion. See Textile Workers' Union of America, AFL–CIO v. NLRB, 386 F.2d 790 (2 Cir. 1967).

■ The evidence already summarized demonstrates that United asserted doubt that the Union represented an uncoerced majority, and that such doubt was in fact reasonable. Assuming as we do that knowledge of circumstances justifying the doubt is also required for good faith, the evidence also shows this. On April 23 and 24 three employees informed Emanuel Lipetz that the Union had threatened them with discharge or loss of benefits if they failed to sign cards. When Alexander Lipetz informed Mandelker of these facts on the afternoon of Friday, April 24, the latter sent an attorney to interview the employees; they and a fourth employee signed affidavits showing fraud, coercion or both. It was only after Mandelker had reviewed these

affidavits on the morning of Monday, April 27, and advised that they afforded reasonable grounds for not proceeding with the card check that the employer declined to do this. This evidence,[12] if considered alone, went far beyond what the Board has held sufficient in other cases to require a conclusion that General Counsel had failed to discharge his burden of negating good faith doubt. See, e. g., Textile Workers' Union of America, AFL–CIO v. NLRB, supra. The Trial Examiner nevertheless rejected the defense on the basis that "respondent's antecedent unfair labor practices preclude any finding that its refusal to recognize the Union was based upon any bona fide doubt as to the Union's majority" and that "In such circumstances, any doubt which Respondent entertained concerning the Union's claim of majority was accidental and not a reflection of a good-faith approach to its statutory obligations." As we indicated in NLRB v. River Togs, Inc., 382 F.2d 198, 207–08 (2 Cir. 1967), conclusory statements of this sort constitute an inadequate analysis.

■ Clarity is aided by recognizing at the outset, as we did in River Togs, that when an employer's violations of § 8(a) (1) have been so serious that the Board can reasonably conclude he has rendered a fair choice by employees impossible, it is empowered to issue a bargaining order, under the limits indicated in NLRB v. Flomatic Corp., 347 F.2d 74 (2 Cir. 1965), if it deems this appropriate, irrespective of employer doubts concerning, or even of the existence of, an untainted pro-union majority. If United had persisted in the type of conduct signalized by the discharge of

11. The employer also argues that the participation of supervisors in the Union's organizational campaign was so substantial as to undermine the validity of all of the cards solicited and cites a recent decision of the Fourth Circuit, NLRB v. Heck's Inc., 386 F.2d 317 (1967). But the Court there held that "*absent other proof* of the voluntariness of each of the 20 authorizations [making up the majority], the record fails to disclose that

the union represented the free and untrammeled choice of a majority of the employees * * *." (emphasis supplied). Consequently, the case is, like *Thompson*, distinguishable from the one at bar.

12. There was also the fact, known to United, that a considerable number of employees had very scant command of English. See NLRB v. River Togs, Inc., 382 F.2d 198, 204–207 (2 Cir. 1967).

Wiprovnick, an unfair labor practice going "to the very heart of the Act," NLRB v. Entwistle Mfg. Co., 120 F.2d 532, 536 (4 Cir. 1941), and Kushner's threat to Giraud, both on April 21, this could well have become such a case. But the Examiner did not base his conclusion, which the Board affirmed, on any such theory, and the totality of the employer's conduct, including its consent to a card check, its withdrawal of this only on discovering fraud and coercion by the Union, and the relatively minor character of the Jarkoff and Sciutto incidents—would deprive any conclusion that the employer's conduct warranted administration of this "strong medicine," NLRB v. Flomatic Corp., supra, 347 F.2d at 78, on the basis of § 8(a) (1) alone, of the substantial evidence needed to support it.

 Returning to the issue of good faith doubt, we recognize the Board may properly insist not only that there be a reasonable basis for doubt but that this be a substantial reason for the employer's refusal to recognize the union rather than simply an excuse later manufactured for a position he would have taken in any event, and that his commission of unfair labor practices has some bearing on these issues, particularly the latter. We part company with the Board only on those occasions when it fails to determine just what the bearing is and relies instead on a *per se* rule without foundation in logic or experience. See NLRB v. James Thompson Co., supra, 208 F.2d at 746; NLRB v. River Togs, Inc., supra, 382 F.2d at 206–207; cf. Local 357 IBT, etc. v. NLRB, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961).

 The discharge of Wiprovnick on April 21, serious an unfair labor practice as that was, has almost no tendency, when set against all that transpired thereafter, to show either that on April 27 the employer did not in fact entertain reasonable doubt of the union's majority status or, as in NLRB v. Consolidated Rendering Co., 386 F.2d 699 (2 Cir.

1967); and Bryant Chucking Grinder Co. v. NLRB, 389 F.2d 565, 569 n. 1 (2 Cir. 1967) (concurring opinion), that it would have refused to recognize the union even if it had no such doubt. The thesis that unfair labor practices universally negate good faith doubt, since an employer would not indulge in such tactics unless he was convinced of the union's majority or meant to disregard it in any event, rests on a rather shaky foundation. Commission of such practices before the union has even claimed a majority casts no shadow on the existence of doubt when the claim is later made. While unfair practices after the union's claim are somewhat more probative on that point, they are far from conclusive since the employer generally does not know or have the means of knowing how far the claim is valid when misrepresentation or coercion is reasonably suspected; his seeking to prevent further adherence to the union thus is "as consistent with a desire to prevent the acquisition of a majority as with a purpose to destroy an existing majority." [13] Cf. NLRB v. Bedford-Nugent Corp., 317 F.2d 861, 865 (7 Cir. 1963); People's Service Drug Stores, Inc. v. NLRB, 375 F.2d 551, 556 (6 Cir. 1967). Although unfair practices, whether before or after the union's claim of majority status, are relevant to the contention that the employer would not have recognized the union no matter what the facts turned out to be, this requires an analysis of the practices against the totality of the employer's conduct which was not here performed. If it had been, the conclusion that General Counsel had not sustained his burden would necessarily have followed. The employer's change of position, made only after receiving well-founded reports of Union threats to employees, in no way reflects on its good faith evidenced by its agreement to a card check.

(C). *Union violence.* The Trial Examiner's failure to perform the needed

---

13. Lesnick, Establishment of Bargaining Rights without an NLRB Election, 65 Mich.L.Rev. 851, 855 (1967).

evaluation of the employer's conduct may have been due to the fact that his ruling as to lack of good faith doubt did not affect his ultimate decision with respect to § 8(a) (5). Relying on Laura Modes Company, 144 N.L.R.B. 1592 (1963), he dismissed the portions of the complaint alleging a violation of that subsection because of the Union's resort to violence during the strike.[14] The Board reversed this. It distinguished *Laura Modes* primarily on the ground that the union in that case "evidenced a total disinterest in enforcing its representative rights

through peaceful legal process provided by the Act in that it resorted to and/or encouraged the use of violent tactics to impel their grant," whereas here the Union invoked the Board's processes. It minimized the Union's acts of violence as mere "outbursts" which "took place in the heat of picket line tensions" and not "part of a plan of intimidation."

This mild reference bears little relation to the undisputed findings of the Trial Examiner which we reproduce in full;[15] indeed even his description lacks

[14]. An additional reason lay in the Examiner's "doubts concerning the reliability of the designation obtained by the Union."

[15]. "Although beginning on April 28, 1964, the Union induced Respondent's employees to remain away from work, according to Foner [the union organizer], 'an official strike and picketing of the company's premises' did not begin until Thursday, April 30. The violence and intimidatory conduct directed against the Company and the nonstriking employees, which characterized the strike, began the next day. On May 1, the automobile in which Emanuel Lipetz and several employees drove to the plant was stoned. On the same day: an individual, whom Emanuel Lipetz believed was Thomas, forcibly attempted to remove a wooden barricade which had been used by the Company to seal off an inoperative door; Thomas went to the floor of the building where Tatarka was working and told him not to go to work the next day because the place will be tightly sewed up with pickets; and Thomas and Zayas threatened to beat Ivan John Rodriguez.

"The most serious incidents occurred the following Monday, May 4. A large number of pickets variously estimated from 30 to 100, many of whom were not employees of the Company, were at Respondent's premises when Emanuel Lipetz, Ivan John Rodriguez and four women arrived in an automobile. The Union's international representative, William Geffner, who was present, shouted to the pickets not to let the occupants out of the car and not to let them into the building. He then charged at the car with some of the other pickets. Rodriguez, noticing that someone was trying to reach into the back of the car to grab Mary Zdunczyk, opened the door in order to assist her. Adolph Thomas

and several other people then forced Rodriguez out of the car and pushed him to the front where he was attacked and knocked to the ground by a blow delivered by Marvin Wiprovnick. A police officer apprehended and forceably restrained Wiprovnick. As Rodriguez arose he heard shouts to 'get him' and began to run. He was caught in the middle of the street and was again beaten to the ground. He was rescued by the arrival of another policeman. Rodriguez suffered from bruises and contusions as a result of these events.

"About the same time Emanuel Lipetz was attacked. As Lipetz got out of the car he was struck by one of the pickets. He was then pushed towards the front of the car where Geffner grabbed hold of the lapels of his coat. When Geffner released his hold, Thomas struck Lipetz a couple of blows knocking Lipetz to the ground. After Lipetz picked himself up, Thomas struck him several more times, again knocking him to the ground. As a result of this incident Lipetz suffered a fractured leg. Lipetz, who is an older man and judging from his appearance is more than 65 years of age, was confined to the hospital for 5 weeks and then in bed at home until August 4. It was not until October 15 that he was sufficiently recovered to return to work.

"Considerable testimony was adduced concerning other incidents after May 4 such as threats to nonstriking employees and minor acts of violence as throwing tomatoes and stones and pulling jackets. In addition, one nonstriking employee, Fosley, was severely beaten. However, this incident did not occur near the plant so that, except by surmise, there is no evidence that the Union or any strikers were responsible. On May 19 four striking female employees assaulted a group of nonstriking women who were attempting to go to work. This incident involved

the color the full record gives.[16] How the Board can say that an unprovoked attack by "a large number of pickets * * * many of whom were not members of the company," carried to the point of grabbing a female employee, knocking a male employee to the ground, and making repeated attacks on the owner which incapacitated him for five and a half months—all with the active participation of the Union's international representative—does "not appear to be part of a plan of intimidation" is beyond our capacity to understand.

In dealing with Board orders requiring an employer to reinstate unfair labor practice strikers guilty of misconduct, the courts have held that the Board must "balance the severity of the employer's unfair labor practices which provoked the industrial disturbance against whatever employee misconduct may have occurred in the course of the strike." NLRB v. Thayer Co., 213 F.2d 748, 755 (1 Cir.) (Magruder, J.), cert. denied, 354 U.S. 883, 112 U.S.App.D.C. 107 (1954); Local 833, UAW, etc. v. NLRB, 112 U.S. App.D.C. 107, 300 F.2d 699 (D.C.Cir.), cert. denied, 370 U.S. 911, 82 S.Ct. 1258, 8 L.Ed.2d 405 (1962). We should have the gravest doubt whether the Board's order could be defended if that were the test here; indeed its own balancing found the scales tilted against Wiprovnick. As against the Board's reference to "a background of Respondent's hostili-

considerable physical contact. A final incident was the assault by Marvin Wiprovnick upon Irvin Cohen which occurred on June 26."

16. Emanuel Lipetz described the attack upon him led by William Geffner (international union representative), Adolph Thomas, and Chappell Ball as follows:
At that time the barrage of fists from all sides got over my body, and I was leaning pinned against the front fender. In that second—everything happened in seconds. I saw the body of Rodriguez fall down on the street—Geffner, who holding me on my lapels, trying not to let me get out, was slightly surprised what happened to Marvin [Wiprovnick], went to help him. At that moment I got the first struck and I first saw Thomas on my left ear * * *. He struck me here once. Then I make two steps. He strike me another time. I fell * * *. I pick up myself very fast and try to make one step. I got another blow * * *. From Thomas, always Thomas and Thomas. It lasted four, five times. I can't remember the quantity, but the last blow, it was more stronger than any one I felt because he tripped me and I fell very heavy all the way down to the ground and I picked up myself with difficulty, and get up * * *. I observed Geffner running towards northwest corner Hudson Street. He stop for a second in front of the curbs, our eyes met—strange way, I don't understand how, and he shouted to me, "Your leg is broken, go to curb. Somebody is going to help you there." And he ran north direction, Hudson Street.

Geffner, Thomas and Ball pleaded guilty to a charge of assault in the third degree and were sentenced to a year's probation.

Ivan Rodriguez described the attack upon him led by Marvin Wiprovnick:
"Someone had struck a blow and I didn't lose consciousness or anything. I looked up and I noticed Marvin Wiprovnick with a clenched fist, just completing a swing * * *. After I hit the ground I immediately jumped up and I noticed that three or four strangers, which I never had seen before, set upon me and they tried to grab me, and I heard several people screaming to get me—get him, get him. I turned and I ran. When I reached halfway across, or over—across Beach Street, to the other curb, I noticed —I realized it was useless, because too many people were coming after me, so I came back and tried to see if I could get the assistance of a policeman, and when I reached the middle of the street, between the two curbs, I felt a blow on my back and I went down again and then they just beat me until finally a plain-clothesman came to my rescue."

Marvin Wiprovnick was found guilty of assault in the third degree and was sentenced to thirty days in jail. Employees Cardona, Orroca, Borges and Garcia pleaded guilty to a charge of disorderly conduct.

The employer made no attempt to use strikebreakers. Compare NLRB v. Remington Rand, Inc., 94 F.2d 862, 867 (2 Cir. 1938).

ty to the Union, including discriminatory discharges and serious violations of § 8 (a) (1), and Respondent's use of dilatory tactics aimed at dissipating the Union's majority strength," we have found a single discriminatory discharge—although of a serious nature—and three violations of § 8(a) (1), two relatively minor. So far as concerns dilatory tactics, it is hardly disputed that the company's ultimate declining of a card check was in good faith; moreover, it filed a charge against the Union immediately on learning of its coercive campaign practices and supplemented this nine days later. On the other hand, our discussion shows how far the Board understated the extent of the Union's misconduct.

 However, we are not at all convinced that the standards in the two situations should be the same. In the reinstatement cases balancing is highly appropriate since the employee must either be rehired or not be; in the bargaining situation there is usually a third solution, to wit, an election, certainly the preferred way of testing employee sentiment,[17] and consequent less need for condoning serious breaches of the peace. It is exceedingly hard to believe that Congress meant to authorize the Board to require bargaining with a union having a bare card-count majority which has attempted to increase this or to enforce its claim to representation by hitting other employees or the employer on the head. As said by Chief Justice Hughes, "There is not a line in the statute to warrant the conclusion that it is any part of the policies of the Act to encourage employees to resort to force and violence in defiance of the law of the land." NLRB v. Fansteel Metallurgical

Corp., 306 U.S. 240, 257–258, 59 S.Ct. 490, 497, 83 L.Ed. 627 (1939). The only cases where arguably a union's resort to serious violence to enforce its demands might be disregarded would be when the employer's conduct has rendered a fair election impossible. But the Board made no such finding here and, as previously indicated, we see no substantial evidence on which it could.

For the reasons we have above stated, we decline to enforce the portion of the order requiring bargaining whenever the union might suggest that bargaining begin.

Enforcement granted in part, denied in part.

---

**17.** The Board noted this in *Laura Modes,* saying:

> We recognize of course that the employees' right to choose the Union as their representative survives the Union's misconduct. But we believe it will not prejudice the employees unduly to ask that they demonstrate their desires anew in an atmosphere free of

any possible trace of coercion. Our order here and the voluntary agreement of the Union * * * to refrain from any and all misconduct of the kind mentioned in the charges, will, we believe, afford the employees with the desirable conditions for making their free choice. 144 N.L.R.B. at 1596.